In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-3961 & 98-4139

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CAROL HOOGENBOOM,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 123--Milton I. Shadur, Judge.

Argued February 24, 2000--Decided April 4, 2000

Before POSNER, Chief Judge, and CUDAHY and EVANS,
Circuit Judges.

EVANS, Circuit Judge.  Dr. Carol Hoogenboom's
scheme to swindle Medicare by filing bills for
services she did not provide to elderly mental
patients hinged on her assumption that "no one
will believe a crazy lady." But the FBI did. More
importantly, so did a federal judge who found
Hoogenboom guilty on a bevy of charges after a
week-long bench trial. In all, Hoogenboom's
shenanigans led to convictions on 15 counts: 5
for mail fraud, 3 for filing false claims with
Medicare, 6 for money laundering, and 1 for
obstruction of justice. These earned her
concurrent sentences, the top being for 70
months.

Hoogenboom isn't your typical chiseler. After
earning undergraduate and master's degrees in
psychology from Western Michigan University, she
completed a PhD at the Forrest Institute of
Professional Psychology. She then spent 2 years
interning, passed the Illinois state licensing
exam, and received her state psychologist's
license. With that, after nearly 15 years of hard
work, Hoogenboom founded her own practice.

When she set up shop, Hoogenboom contracted
with Medicare to become a part B provider. This
meant she could submit reimbursement claims to

Medicare for any medically necessary services she provided to Medicare beneficiaries. As it turned out, she preferred submitting claims to providing services.

Beginning in June 1995 Hoogenboom filed claims stating that she frequently visited her "patients"--a group of elderly, mentally ill Medicare beneficiaries living in three Chicago retirement homes--to conduct 45- to 50-minute individual therapy sessions. To receive payment for the purported sessions Hoogenboom would fax "activity sheets" to her sister, Carrie Weldy, containing the patients' names, medicare numbers, the alleged dates of service, and the type of services allegedly provided. Weldy, who served as a salaried bookkeeper, would then phone in the claims to Medicare for reimbursement. Unbeknownst to Weldy, the services she billed for were either not performed, or not performed as billed.

In January 1996 Hoogenboom hired Hanan Shaktah to help expand her operation. Hanan/1 had an undergraduate degree in psychology which she hoped she might put to use in her new job. Instead, Hoogenboom gave her a list of about 70 patients and told her to visit them once or twice a week to make sure they were still "alive and breathing." When Hanan mastered the routine, Hoogenboom added another 53 patients to her rounds. The visits lasted only a minute or two, but on Hoogenboom's orders Hanan submitted activity sheets stating that she provided 45- to 50-minute counseling sessions to each of her patients at least three times a week. In exchange for her efforts, Hoogenboom gave Hanan a taste of the Medicare reimbursement money.

Hoogenboom was so impressed with Hanan's work that by June she decided to bring Hanan's brother Thaer onto the workforce. Thaer did not have a degree in psychology, but he had been arrested for assault and battery on numerous occasions. So Hoogenboom thought he'd make a fine "therapist," and soon enough he, too, was submitting activity sheets recapping lengthy counseling sessions. In reality, Thaer performed the same job as his sister--moving door-to-door within the retirement homes making sure that the Medicare recipients were still alive.

With the Shaktahs taking care of her clients, Hoogenboom stopped visiting the facilities. And once Thaer came on board, Hanan also ceased her visits. Nevertheless, the billing continued on pace. In all, from June 1995 until October 1996 Hoogenboom submitted approximately 11,000 claims to Medicare for reimbursement. Based on these claims, she received $480,617.54, which she deposited into two accounts at First National

Bank in Chicago.

Despite the fact that she was bilking the federal government out of nearly $50,000 a month, and frequently billed for more than 24 hours in a day, Hoogenboom confidently predicted that she would never get caught. She told Hanan that when it came to filing false Medicare claims "the sky's the limit." She further explained to Thaer that even if some of the patients became aware of the scam it would never put her in jeopardy, since no one would take the word of a "crazy lady" over that of her psychologist.

Unfortunately for Hoogenboom, the FBI did not operate on the same assumption. Thus, when a few of Hoogenboom's more nimble-witted patients reported to Medicare that they were receiving statements detailing counseling services that had not been performed, the FBI launched an investigation and quickly began to uncover evidence of Hoogenboom's scheme.

Bureau agents confronted Hoogenboom about her billing discrepancies on October 2. She told them that she and her assistants had in fact performed the services claimed, that they had provided mostly psych testing services and very little therapy, that she was always present when her assistants conducted the testing, that she visited all the facilities three to four times per week, and that her assistants both had undergraduate degrees in psychology.

When the interview ended, the cover-up began. Hoogenboom immediately met with Hanan and instructed her not to speak to the FBI. She then called Weldy and told her to tell the FBI that the two didn't know each other. The next day, Hoogenboom withdrew $101,000 from First National, explaining to Thaer that she feared the Bureau would "freeze her accounts."
By October 21 Hoogenboom had become desperate. She sent the following fax to Weldy, written in print so small Weldy had to blow it up on her copier to read it:

Ner,/2 immediately burn all logs, time sheets of everyone. Make sure only ashes are left. Burn this page, too. I will explain later. Tell Mommo and Conco/3 to talk to no one about me. If the FBI visits them they are to say nothing. Even that they don't know me./4 Tell them the same thing. . . . You guys are to talk to no family or relatives about me, no neighbors, and no new friends.

Weldy, the hero of our story, not only refused to comply, but immediately gave the FBI the fax and all the materials she was supposed to burn.

The Shaktahs, who flipped following their arrest (they pled guilty to charges and received probation), also reported that Hoogenboom attempted to thwart the FBI. At trial they testified that during the investigation Hoogenboom tried to persuade Hanan not to cooperate, instructed Hanan to prepare fake progress notes for the services covered in the indictment, attempted to convince a real psychologist to falsely testify that she treated the patients, and threatened Thaer that if he ever testified against her she would press charges against him for forging her checks.

Hoogenboom told a markedly different story. She testified that she performed all the work she billed up until she hired Hanan, but that from then on she assumed a purely supervisory role. She said that, after initially supervising Hanan's activities quite closely, she was fooled into believing that Hanan was still treating the patients. She also said that Hanan convinced her to hire Thaer and that Hanan was responsible for supervising his work. Finally, she reported that once she became aware that the two were conning her, she immediately fired them both.

The judge was underwhelmed by this defense. He said Hoogenboom's "preposterous effort to rationalize" her conduct and "prevail on the balance of her own perjury" could hardly "avoid the crushing impact . . . [of] the overwhelming evidence that the government provided with respect to her guilt."

On appeal, Hoogenboom attacks three of her four convictions and argues that the judge erroneously applied a couple of 2-point adjustments to his calculus of her sentence under the guidelines. Interestingly, she does not contest her conviction for obstruction of justice--the crime for which she drew the longest concurrent sentence. This means that even if Hoogenboom prevails--gets her money laundering, false claims, and mail fraud convictions overturned and both 2-point adjustments set aside--she stands to gain only mild relief. But she is entitled to seek what she can, so with the limited prospects for a real major victory in mind, we turn to her contentions.

We begin with Hoogenboom's first challenge to her money laundering conviction. To violate the federal money laundering statute the government must prove, inter alia, that a defendant engaged in or attempted to engage in "a monetary transaction." 18 U.S.C. sec.1957. As defined by the statute, a monetary transaction "does not include any transaction necessary to preserve a

person's right to representation as guaranteed by the Sixth Amendment to the Constitution." 18 U.S.C. sec.1957(f)(1)./5 Hoogenboom argues that since she testified that she eventually used the money she removed from her bank accounts to pay her attorneys, the withdrawals were not "monetary transactions."

To the extent Hoogenboom challenges the sufficiency of the evidence supporting her conviction, we review to determine whether the fact finder's take on the evidence was wholly irrational when viewed in the light most favorable to the government. See United States v. Thornton, 197 F.3d 241, 253-254 (7th Cir. 1999), cert. denied sub nom. Reynolds v. United States, ___ S. Ct. ___, 2000 WL 190036 (Mar. 6, 2000). To the extent that she asks us to interpret the federal money laundering statute, we review the district court's determinations de novo. See United States v. Shriver, 989 F.2d 898, 901 (7th Cir. 1992).

Hoogenboom's claim that she used the money she withdrew on October 3 to pay her lawyers is supported only by her conclusory testimony at trial. She did not specify the dates or the number of payments she made, nor did she introduce any records or other evidence to show how she used the money. She simply stated that at some point, well after the transaction, she paid her attorneys with the funds. This evidence in no way undermines the district court's findings. Standing alone, Hoogenboom's testimony, rejected as it was by the district court, could not show that she used the funds in the manner she claimed.

But even if Hoogenboom were believed, the same result would follow. She does not contest Thaer's statement that she made the October 3 withdrawals to prevent the FBI from freezing her accounts. She rather argues that since she later spent the money on lawyers the transactions should be covered by the statute's Sixth Amendment exception.

This is preposterous. Under Hoogenboom's conception of the statute, every defendant charged with money laundering under 18 U.S.C. sec.1957 could, at any time, beat the charge by funneling the proceeds which constituted the initial, illegal transaction toward their defense. Since this interpretation would render the statute useless in the face of any money launderer armed with a minimally competent attorney, we reject it. Congress would not bother passing such an easily circumvented law. Instead, the exception appears to have been inserted to prevent the broad reach of the statute from

criminalizing a defendant's bona fide payment to her attorney. See United States v. Rutgard, 116 F.3d 1270, 1291 (9th Cir. 1997); see also, 134 Cong. Rec. S17630 (daily ed. Nov. 10, 1988) (statements of Sens. Biden and Kennedy).

Correctly read, the statute offers a defense where a defendant engages in a transaction underlying a money laundering charge with the present intent of exercising Sixth Amendment rights. This allows a defendant to preserve her rights without undermining the prosecution of those the statute seeks to punish. Since Hoogenboom did not clear out her accounts to pay her attorney--the evidence is that she engaged in the transaction to prevent the FBI from seizing the money--she cannot squeeze within the slim Sixth Amendment exception to the statute's broad definition of what constitutes a monetary transaction.

Hoogenboom next contends that the government failed to show that she possessed the requisite mens rea to support her convictions on all crimes except obstruction of justice. She argues that since the prosecution's only evidence of her intent came from the testimony of the Shaktahs, and this directly conflicted with her own more believable testimony, the prosecution failed to prove its case beyond a reasonable doubt.
Again, preposterous. The district court called the evidence against Hoogenboom "crushing" and "overwhelming." Indeed, the court noted that even without the Shaktahs' testimony Hoogenboom was proven guilty beyond a reasonable doubt. Plus, the judge expressly found that Hoogenboom's testimony was perjured. Viewing the case in any light--let alone that most favorable to the government--there was ample evidence to support the finding that Hoogenboom intended to commit her crimes.

This brings us to the sentencing issues which are not presented, by either side, with great clarity. And that's not surprising since the sentencing hearing itself was not a model of clarity as everyone, in a desultory fashion, engaged in long musings which led to a rather confusing record.

On appeal, the parties have confused several concepts, using terms of art like "upward departures" interchangeably with "adjustments." Similar misstatements pop up where, for instance, Hoogenboom says in her brief that the judge set "the base offense level" at "27" which reflected "the following four upward enhancements." This statement is then followed by a list of five, not four, adjustments. Also, the "base offense level" in this case was not "27." It was "6" for two of

Hoogenboom's crimes (mail fraud and false claims), "12" for the obstruction charge, and "17" for money laundering. But because the mail fraud and false claim counts ended up a little higher after various adjustments, we need only focus on them. And here's how the sentence was built:

6 points--Base offense level

9 points--A specific offense characteristic adjustment under guideline sec.2F1.1(b)(1)(J) because the fraud exceeded $350,000

2 points--A specific offense characteristic adjustment under sec.2F1.1(b)(2) because "more than minimal planning" was involved.

To these computations, four 2-point "adjustments" were added to bring the "adjusted offense level" to 25, which yielded a sentencing range of 57 to 71 months. With 5 years as the statutory maximum penalty for all crimes except obstruction (which is 10 years), Hoogenboom received 60-month terms on all the charges except obstruction, for which she drew a 70-month sentence. The sentences were ordered to be served concurrently.

The four 2-point adjustments were for:

(1)  Vulnerable Victim--sec.3A1.1(b)(1)

(2)  Abuse of Trust--sec.3B1.3

(3)  Role in the Offense--an Organizer--sec.3B1.1(c)

(4)  Obstruction of Justice--sec.3C1.1

Hoogenboom challenges two adjustments: vulnerable victim and abuse of trust. Although we have spent quite some time laying out the framework of this sentence, we will tarry only a moment on Hoogenboom's objections, which we find to be without merit.

The best argument against the "vulnerable victim" enhancement might have been that the victim was really the government, not the infirm nursing home patients who were denied services. But that argument wasn't made below, so it's waived on appeal. And even if not waived, in these circumstances the elderly and infirm residents were so closely involved with the scheme that it does no violence to the guidelines to conclude that they were victims. One of the reasons for increasing a criminal penalty based on the type of victim is that vulnerable ones are less likely to report that they have been

cheated, so crimes against them are more difficult to uncover. Here, Hoogenboom's choice of victims allowed her to go undetected for more than a year. In fact, if she had made sure all of her patients were incoherent, she might not have been caught. The vulnerable victim enhancement, accordingly, was correctly applied.

Ditto for the abuse of trust enhancement. Medical service providers occupy positions of trust with respect to private or public insurers (such as Medicare) within the meaning of guideline sec.3B1.3. See United States v. Geiger, 190 F.3d 661 (5th Cir. 1999), and United States v. Ntshona, 156 F.3d 318 (2d Cir. 1998). Medicare providers such as Dr. Hoogenboom enjoy significant discretion and consequently a lack of supervision in determining the type and quality of services that are necessary and appropriate for their patients. This forces Medicare to depend, to a significant extent, on a presumption of honesty when dealing with statements received from medical professionals. The adjustment here was properly invoked.

For all of these reasons, the judgment of the district court is AFFIRMED.

/1 Hanan's brother enters the scene in a moment, so we'll refer to Ms. Shaktah by her first name.

/2 Weldy's family pet name.

/3 Weldy and Hoogenboom's parents.

/4 By this point, it seems Hoogenboom really should have been giving the FBI a little more credit. To think that they'd be thrown off by tiny print and parents who claim they do not know their own child suggests Hoogenboom could have used some counseling herself.

/5 In full, this section of the statute reads:

[T]he term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the Sixth Amendment to the Constitution[.]