TRAXLER, Chief Judge,
dissenting from Part IV:
I cannot subscribe to the view that the “safe harbor” provision Congress created *776 to shield criminal defense attorneys from prosecution under § 1957 is no longer effective. I do not believe this view is consistent with the statute. Moreover, I am troubled by the potential fallout from the elimination of the protection Congress afforded legitimate criminal defense attorneys when they accept bona fide legal fees from clients charged with or suspected of drug trafficking and other criminal conduct.
Blair’s conduct was unquestionably reprehensible, and it was particularly offensive to members of the legal profession. The actual text of the statute, however, constrains me to conclude that the two transactions in question — which secured competent, legitimate criminal defense attorneys for Saunders and Bernard — are exempt from prosecution under § 1957(f)(1).
A.
1. Section 1957 and Its Purpose
Count 9 of the indictment charged Blair with violating 18 U.S.C. § 1957(a) when he used $20,000 in drug proceeds to purchase two $10,000 SunTrust bank checks to retain Virginia attorneys Boone and Yoffy to represent Saunders and Bernard, respectively. Although Blair also retained for himself $10,000 of the drug proceeds for legal services he purportedly performed, that fact was not charged in Count 9 as part of the offense conduct and has no bearing on whether Blair violated § 1957 by purchasing the bank checks.
Section 1957(a) provides that “[w]hoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity” shall be guilty of a crime. 18 U.S.C. § 1957(a) (emphasis added).[1] “Monetary transaction” as used in § 1957 “means the deposit, withdrawal, transfer, or exchange ... of funds or a monetary instrument ... by, through, or to a financial institution.” 18 U.S.C. § 1957(f)(1). Thus, § 1957 criminalizes transactions that “mov[e] around at least $10,000 in criminal proceeds for any purpose through a financial institution,” United States v. Kratt, 579 F.3d 558, 561 (6th Cir.2009), provided that the defendant knows that “the subject of the transaction is criminally derived property.” United States v. Allen, 129 F.3d 1159, 1165 (10th Cir.1997). Unlike § 1956, which prohibits classic money laundering, § 1957 “does not require that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design.” United States v. Wynn, 61 F.3d 921, 926-27 (D.C.Cir.1995); see United States v. Rutgard, 116 F.3d 1270, 1291 (9th Cir.1997) (“The description of the crime does not speak to the attempt to cleanse dirty money by putting it in a clean form and so disguising it.”).
Consequently, because § 1957 requires only that the defendant know that the transaction involves proceeds of unlawful activity and contains no “ ‘design to conceal’ element, section 1957 prohibits a wider range of activity than money ‘laundering,’ as traditionally understood.” Wynn, 61 F.3d at 927. Indeed, “[t]his statute applies to [even] the most open, aboveboard transaction^]” that would otherwise be innocent and lawful. Rutgard, 116 F.3d at 1291. Congress enacted *777 § 1957 “as a tool in the war against drugs,” id., designed to “make the drug dealers’ money worthless” by criminalizing transactions in which the participants knowingly give or accept money derived from unlawful activity. H.R.Rep. No. 99-855, at 13 (1986) (internal quotation marks omitted); see Anti-Drug Abuse Act of 1986, Pub. L. 99-570, Subtitle H, 100 Stat. 3207 (1986). Thus, § 1957 applies by its plain terms not just to drug dealers and other criminal defendants but also to otherwise legitimate, law-abiding citizens who transact business with such individuals knowing that the transaction involved criminally derived proceeds.[2]
Before passage of § 1957, there was substantial debate about whether a safe harbor provision should be included in the statute. The House Subcommittee on Crime was concerned about the exposure of criminal defense lawyers to prosecution for accepting tainted legal fees and proposed an exemption for attorney’s fees in the original version of § 1957. Specifically, proponents of the attorney’s fees exemption argued that it was necessary to prevent § 1957 from chilling the attorney-client relationship in criminal matters; without it, criminal defense attorneys might not investigate their clients’ cases fully for fear of learning information that could trigger their own liability under the statute. See H.R.Rep. No. 855, at 14.[3] Ultimately, the exemption was dropped from the initial bill and § 1957 was enacted in 1986 without a safe harbor provision for attorney’s fees.
The American Bar Association (ABA) and the National Association of Criminal Defense Lawyers (NACDL) remained concerned about the chilling effect of § 1957 on criminal defense attorneys and their clients, however, and continued to press for passage of a safe harbor provision. Congress enacted such a provision in 1988. See Pub. L. 100-690, § 6182, 102 Stat. 4181, 4354 (1988).
It is not hard to appreciate the problem faced by the criminal defense bar in the *778 absence of an exemption. During the routine process of investigating and preparing a client’s case, an attorney might learn that his client’s only income derived from criminal activity, making it technically illegal under § 1957 to receive and deposit further payments for legal fees. This possibility leaves the attorney with somewhat of a Hobson’s choice at the outset of a case: either investigate fully and risk learning that the client’s funds are tainted, or avoid thoroughly investigating any matter that might lead to such knowledge. Of course, failing to fully investigate is not really an option — an attorney who does so not only fails to fulfill his professional obligations to his client but, in light of the “willful blindness” doctrine, he is unlikely to circumvent the § 1957(a)’s knowledge requirement in any event. See United States v. Schnabel, 939 F.2d 197, 203 (4th Cir.1991) (“The willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely dosed his eyes to avoid knowing what was taking place around him.”) (emphasis added); United States v. Abbas, 74 F.3d 506, 513 (4th Cir.1996) (“A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance.”) (internal quotation marks omitted)(emphasis added).[4]
2. The 1988 Safe Harbor Amendment to § 1957(f)(1)
In 1988, Congress amended the definition of “monetary transaction” to exclude “any transaction necessary to preserve a person’s right to representation as guaranteed by the sixth amendment to the Constitution.” 18 U.S.C. § 1957(f)(1) (emphasis added). The effect of this safe harbor provision in § 1957(f)(1) was to exempt from prosecution under § 1957(a) an otherwise illegal transaction using criminally derived proceeds where that transaction is necessary to “secur[e] legal representation to which an accused is entitled under the Sixth Amendment.” See United States v. Velez, 586 F.3d 875, 877 (11th Cir.2009). The safe harbor provision added by the 1988 amendment was similar to a provision that was ultimately dropped from the version of § 1957 that was enacted in 1986. Congress was focused on the potential criminal liability of defense attorneys under § 1957 and the possible chilling effect on the attorney-client relationship such potential liability might produce.
The phrase “a person’s right to representation as guaranteed by the sixth amendment to the Constitution” limits transactions protected under § 1957(f)(1) to those securing representation in connection with a criminal proceeding as opposed *779 to any legal matter whatsoever. See id. (“[T]he exemption is limited to attorneys’ fees paid for representation guaranteed by the Sixth Amendment in a criminal proceeding and does not extend to attorneys’ fees paid for other purposes.”). The Sixth Amendment provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” U.S. Const, amend. VI. This right includes, in part, “the right of a defendant who does not require appointed counsel to choose who will represent him.” United States v. Gonzalez-Lopez, 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Thus, § 1957(f)(1) protects transactions that would otherwise be illegal, provided the transaction secures legal representation in a criminal proceeding; it does not extend, for example, to the use of drug proceeds to secure legal representation in the civil context.
Although the safe harbor provision ties an exempt transaction under § 1957(f)(1) to the Sixth Amendment, it does not require that the transaction itself be constitutionally protected. Rather, it is the representation — secured by the transaction— that must come within the Sixth Amendment’s guarantee. See Velez, 586 F.3d at 879 (explaining that “the phrase ‘representation as guaranteed by the sixth amendment’ refers, as it always has, to the type of legal representation to which a criminal defendant is entitled under the Sixth Amendment”) (emphasis added). In using the words “to preserve,” which means “[t]o keep in perfect or unaltered condition” and to “maintain unchanged,” The American Heritage College Dictionary 1082 (3d ed. 1997), Congress made clear that an exempt transaction under § 1957(f)(1) must be necessary to secure a person’s Sixth Amendment right to legal representation. See Velez, 586 F.3d at 877. Thus, the transaction itself need not be protected by the Sixth Amendment to come within § 1957(f)(l)’s safe harbor, but it must be necessary to secure a person’s Sixth Amendment right to representation. This is confirmed by common sense — it would accomplish little for Congress to provide an exemption for transactions that are already constitutionally protected.
Of course, not every transaction that secures legal representation in a criminal proceeding comes within the scope of the safe harbor provision. Section 1957(f)(1) requires that a transaction be “necessary” to secure a person’s sixth amendment right to representation. This limit has not been thoroughly fleshed out by the courts, but it seems clear that the availability of the safe harbor will depend on the circumstances. For example, a general retainer to an attorney for ongoing legal advice would not likely qualify for protection under § 1957(f)(1). “Correctly read, the statute offers a defense where a defendant engages in a transaction underlying a money laundering charge with the present intent of exercising Sixth Amendment rights.” United States v. Hoogenboom, 209 F.3d 665, 669 (7th Cir.2000) (emphasis added). Likewise, the payment of an unreasonably large amount in light of the complexity of the criminal proceeding might not qualify as a transaction necessary to secure a person’s Sixth Amendment rights.
3. Application to Blair
In Blair’s case, the transactions at issue in Count 9 were “necessary to preserve a person’s right to representation as guaranteed by the sixth amendment.” 18 U.S.C. § 1957(f)(1). First, it would be difficult to find that the purchase of the two bank checks was not done for the purpose of securing legal representation in a criminal proceeding. Blair purchased checks that were handed over to the Virginia attorneys to secure representation for Saunders and *780 Bernard on drug charges pending in federal court. Second, the amount of each check was reasonable in light of what a criminal defense attorney might legitimately charge for a retainer. Compare Hoogenboom, 209 F.3d at 669 (concluding that the withdrawal of money from a bank account for the purpose of subsequently paying legal fees was not protected under § 1957(f)(1)).
Finally, it bears mentioning that the transactions at issue are not taken outside of the safe harbor provision because Blair secured representation for Saunders and Bernard rather than himself. There is simply no basis in the statutory text for concluding that the safe harbor provision applies only if the transaction was to secure the payor’s Sixth Amendment rights. Quite the opposite. A transaction comes within § 1957(f)(1) if it is “necessary to preserve a person’s right to representation as guaranteed by the sixth amendment.” 18 U.S.C. § 1957(f)(1) (emphasis added). In the context of criminal defense work, it is not uncommon for legal fees to be paid by a family member, a friend, an employer, or some other third party. In such a case, it is well understood that the attorney’s loyalty is to his client, the criminal defendant, not the person who paid the fee. This is fundamental professional responsibility. See, e.g., Va. R. Prof. Conduct R. 1.8(f); Va. R. Prof. Conduct R. 5.4(c). It would undercut the purpose of the amendment to engraft a requirement that the transaction be necessary to preserve the payor’s Sixth Amendment rights — an attorney is exposed to criminal liability under § 1957 if he learns that his fees are the proceeds of unlawful activity no matter who paid them.
B.
The government contends that the safe harbor provision of § 1957(f)(1) does not apply to transactions involving drug proceeds. This clearly cannot be correct. As explained above, for any “monetary transaction” to violate § 1957, the property involved must have “derived from specified unlawful activity.” 18 U.S.C. § 1957(a). By its very terms, § 1957 requires the government to establish that the illegal monetary transaction involved property that “derived from specified unlawful activity.” 18 U.S.C. § 1957(a); see United States v. Johnson, 450 F.3d 366, 375 (8th Cir.2006). It follows that any transaction that comes within § 1957 itself, and within its safe harbor, will necessarily involve tainted proceeds. That is, criminal liability can arise under § 1957 only if the funds at issue are criminally derived proceeds. Neither the statute nor its exemption come into play in the absence of criminally derived proceeds. See Velez, 586 F.3d at 877. It is a given that any time a defendant raises § 1957(f)(1) as a shield, the underlying transaction involves proceeds from unlawful activity such as cash from the sale of drugs.
The government’s position, as I understand it, is that Congress used the phrase “as guaranteed by the sixth amendment” to signal that the scope of the statutory exemption is co-extensive with the scope of the sixth amendment. According to the government, § 1957(f)(1) applies only if the defendant can show that he has a Sixth Amendment right to use the particular funds in question to retain legal counsel. Relying on Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989), the government contends that Blair can establish no such right because the Sixth Amendment does not confer the right to use drug proceeds or any other property that does not belong to him to obtain legal counsel.
*781 There are several problems "with the government’s position. First, this interpretation would render the safe harbor provision meaningless and fly in the face of the interpretive canon requiring courts to “give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous.” Scott v. United States, 328 F.3d 132, 139 (4th Cir.2003).[5] Clearly, no one has a constitutional right to use drug money or other criminally derived proceeds to retain a defense attorney. See Caplin & Drysdale, 491 U.S. at 626, 109 S.Ct. 2646. Since any transaction that comes within § 1957(f)(1)’s safe harbor will necessarily involve criminally derived proceeds, the government’s position effectively reads this provision out of the statute. See Velez, 586 F.3d at 879 (“It would ... make little sense — and would be entirely superfluous — to read § 1957(f)(1) as an exemption from criminal penalties for non-tainted proceeds spent on legal representation, as those funds can always be used for any legal purpose.... [S]uch an absurd result ... nullifies the provision and divorces it from its statutory context, thereby violating basic canons of statutory construction.”).
Second, the government’s position that the safe harbor provision is co-extensive with the Sixth Amendment — leaving it to the Supreme Court to resolve — ignores the language of the statute. As the government would have it, the transaction itself must be constitutionally protected. That is not how § 1957(f)(1) reads. Moreover, if Congress wanted the scope of this provision to be defined solely by the Sixth Amendment, why would an exemption be necessary or even desirable? Such an approach would be baffling. If the Supreme Court determined that use of criminally derived proceeds to secure legal counsel were protected under the Sixth Amendment, then Congress would have accomplished nothing by protecting a transaction already protected by the Sixth Amendment. If, as is the case, the Court determined that the Sixth Amendment does not confer the right to use proceeds from unlawful activity to hire counsel, then the exemption is rendered dead. Such an interpretation — that the scope of § 1957(f)(1) and the Sixth Amendment are coextensive — offends the plain language of the statute and does not reasonably fit in light of the statute’s overall structure. See Velez, 586 F.3d at 879 n. 3.
Third, the government’s argument goes awry largely because of its insistence that Caplin & Drysdale controls the outcome of this case, having rendered the safe harbor provision in § 1957(f)(1) null and void. Caplin & Drysdale, however, clearly does not control, and it is a mistake to force its use as an interpretive guide in this instance.
In Caplin & Drysdale, the Supreme Court considered whether the federal drug forfeiture statute, see 21 U.S.C. § 853(c), violated the Sixth Amendment by permitting the forfeiture of assets that a defendant intended to use to hire his preferred legal counsel, see 491 U.S. at 625,109 S.Ct. 2646. The Court concluded the forfeiture statute was not at odds with the Sixth Amendment, reasoning that the right to choose counsel
does not go beyond the individual’s right to spend his own money to obtain the advice and assistance of ... counsel.... A defendant has no Sixth Amendment right to spend another person’s money for services rendered by an attorney, *782 even if those funds are the only way that that defendant will be able to retain the attorney of his choice.
Id. at 626, 109 S.Ct. 2646 (internal quotation marks omitted).[6] The Court recognized that, by operation of the forfeiture statute, forfeitable drug proceeds do not belong to the accused: “Congress dictated that ‘[a]ll right, title and interest in property’ obtained by criminals via the illicit means described in the statute ‘vests in the United States upon the commission of the act giving rise to forfeiture.’ ” Id. at 627, 109 S.Ct. 2646 (quoting 21 U.S.C. § 853(c)). Thus, Caplin & Drysdale establishes that the Sixth Amendment does not preclude Congress from forfeiting drug proceeds that the accused needs to retain his selected attorney.
Caplin & Drysdale, however, simply does not speak to the meaning of § 1957(f). In the forfeiture statute, Congress chose not to provide an exemption for attorney’s fees. The Court in Caplin & Drysdale refused to read such an exception into the statute and concluded that the statute passed muster under the Sixth Amendment even without such an exception. In § 1957(f)(1), by contrast, Congress did provide an exemption for attorney’s fees. Therefore, for purposes of this case, it matters not that the Sixth Amendment does not confer the right to use drug proceeds to secure legal counsel; Congress has done so in the limited context of money laundering under § 1957.
The Eleventh Circuit, in an extensive analysis, rejected the idea that Caplin & Drysdale has any bearing on § 1957(f)(1). See Velez, 586 F.3d at 878-79. I find the court’s reasoning persuasive:
[Caplin & Drysdale ] held simply that Congress may require the forfeiture of criminally derived proceeds, even if those proceeds are used for legal representation, without running afoul of the Sixth Amendment right to counsel. Contrary to the Government’s argument, Caplin & Drysdale did not alter or refine the meaning of the Sixth Amendment limitation to the exemption in § 1957(f)(1) by its (unremarkable) holding that the Sixth Amendment alone does not require an exemption from forfeiture for tainted proceeds used for attorneys’ fees. Rather, the opinion supports our interpretation of § 1957(f)(1) by highlighting the contrast between Congress’s failure to exempt criminally derived proceeds used for attorneys’ fees from forfeiture and its subsequent decision to exempt such proceeds from criminal penalties.
We likewise view the exemption for attorneys’ fees as a crucial distinction between the criminal charges at issue under § 1957 and the forfeiture provision, and we do not read Caplin & Drys-dale as having any bearing on the phrase “representation as guaranteed by the sixth amendment” in § 1957(f)(1), except to affirm that distinction.
Velez, 586 F.3d at 878-79 (citation omitted).
*783 In sum, Caplin & Drysdale established that the Sixth Amendment does not prohibit the forfeiture of criminally derived proceeds, even if those proceeds are needed for the defendant to hire the attorney of his choice. Section 1957(f)(1), however, establishes that the use of criminally derived proceeds to hire a criminal defense attorney is not itself a fresh criminal act under § 1957(a), provided the defendant can satisfy the “necessity” requirement of § 1957(f)(1). In no sense, therefore, does Caplin & Drysdale render the plain language of § 1957(f)(1) inoperative.
C.
At bottom, the court today nullifies the § 1957(f)(1) exemption and creates a circuit split. See Velez, 586 F.3d at 879. Section 1957 makes it a crime to engage in monetary transactions with money derived from certain specified criminal activities, but § 1957(f)(1) excludes from the definition of “monetary transactions” “any transaction necessary to preserve a person’s right to representation as guaranteed by the sixth amendment to the Constitution.” As discussed above, the phrase “as guaranteed by the sixth amendment to the Constitution” modifies “right to representation,” thus making it clear that the safe harbor applies to monetary transactions involving representation on a criminal charge rather than a civil matter. It appears to me that the court, however, reads that phrase as modifying “transaction,” such that the only transactions protected by the safe harbor are transactions that are themselves “guaranteed by the sixth amendment.”
Because the Supreme Court has held that the sixth amendment does not require that criminal defendants be permitted to use tainted proceeds to pay for a criminal defense attorney, there simply is no monetary transaction that would otherwise fall within the scope of § 1957 that could ever be seen as being guaranteed by or required by the sixth amendment. No one can point to a single circumstance where a transaction involving criminally derived proceeds otherwise subject to prosecution under § 1957(a) would or could fall within the safe harbor provision. The safe harbor exemption is thus read out of existence.
And to make matters worse, by agreeing with the government, we have given defense attorneys cause for concern that once again they risk criminal liability under § 1957 for receiving and depositing legal fees that they suspect to be tainted. This encourages the return of the chilling effect that Congress sought to avoid through its 1988 amendment adding the safe harbor provision to § 1957. Accordingly, I respectfully dissent as to Part IV.

. Under § 1957(a), the government must show: (1) "that the defendant knowingly engaged in a monetary transaction; " (2) "that the defendant knew the property involved derived from specified unlawful activity”; and (3) “that the property was of a value greater than $10,000.” United States v. Johnson, 450 F.3d 366, 375 (8th Cir.2006) (emphasis added).

. The legislative history reflects that Congress wished to dissuade the public from transacting business with those suspected of drug trafficking or other criminal conduct:
A person who engages in a financial transaction using the proceeds of a designated offense would violate this section if such person knew that the subject of the transaction were the proceeds of any crime. The [House Judiciary Committee's Subcommittee on Crime] is aware that every person who does business with a drug trafficker, or any other criminal, does so at some substantial risk if that person knows that they are being paid with the proceeds of a crime and then uses that money in a financial transaction.... [Ojutstanding business people[,] who are otherwise totally moral[,] ... are accepting these funds and profiting greatly from drug trafficking that is going on throughout this country, and this will put a stop to it.
H.R.Rep. No. 855, 99th Cong., 2d Sess. 13-14 (1986); see also H.R.Rep. No. 99-855, pt. 1, at 14 (remarks of Rep. Lungren) (“It is time for us to tell the local trafficker and everyone else, [i]f you know that person is a trafficker and has this income derived from the offense, you better beware of dealing with that person.”). See generally D. Randall Johnson, “The Criminally Derived Property Statute: Constitutional and Interpretive Issues Raised by 18 U.S.C. § 1957,” 34 William & Mary L. Rev. 1291, 1293 (1993) ("Congress specifically intended that liability under section 1957 should extend both to those who actually engage in the criminal activity that generates illegitimate funds and to those who merely receive or otherwise handle illegitimate funds while providing ordinary, legitimate goods or services.”).

. The originally proposed safe harbor provision exempted "financial transactions involving the bona fide fees an attorney accepts for representing a client in a criminal investigation or any proceeding arising therefrom.” H.R.Rep. No. 855, at 1. Opponents of the proposed exception were concerned that the exception was worded too broadly. See 132 Cong. Rec. E3821 (daily ed. Nov. 6, 1986).

. Even the Justice Department recognized the real possibility that attorneys will run afoul of § 1957 with the receipt of legal fees or the use of trust accounts with funds originating from their clients and addressed the issue at length in the United States Attorney’s Manual. See USAM 9-105.600, 9-105.921. The USA's Manual provides that Criminal Division approval is required before an attorney may be charged with a violation of § 1957. See USAM 9-105.300.3. Moreover, the Manual sets forth that, as a matter of policy, an attorney will not be charged under 18 U.S.C. § 1957 unless “there is proof beyond a reasonable doubt that the attorney had actual knowledge of the illegal origin of the specific property received (prosecution is not permitted if the only proof of knowledge is evidence of willful blindness).” USAM 9-105.600. This policy pronouncement affords criminal defense lawyers no particular comfort, however, because section 2103 of the United States Attorney's Criminal Resource Manual states that “a prosecutor who receives approval to prosecute an attorney for a violation of § 1957 based on a monetary transaction arising from the payment of bona fide fees for representation in a criminal matter may request a willful blindness instruction at trial if the evidence warrants such an instruction.”

. The government, in fact, took the position at oral argument that after Caplin & Drysdale, § 1957(f)(1) is effectively void.

. The Supreme Court elaborated further:
A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense. "[N]o lawyer, in any case, ... has the right to ... accept stolen property, or ... ransom. money, in payment of a fee.... The privilege to practice law is not a license to steal.” Laska v. United States, 82 F.2d 672, 677 (10th Cir.1936).
Caplin & Drysdale, 491 U.S. at 626, 109 S.Ct. 2646.