In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3698, 11-2707

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DUMITRU CURESCU and MARIO OLIVELLA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 08 CR 398-2, 398-7—**Joan Humphrey Lefkow**, *Judge*.

ARGUED FEBRUARY 15, 2012—DECIDED MARCH 21, 2012

Before POSNER, FLAUM, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendants were tried together for bribery of an agency that receives federal assistance, 18 U.S.C. § 666 (paying a bribe, in Curescu's case, in violation of section 666(a)(2), and soliciting or accepting a bribe, in Olivella's case, in violation of section 666(a)(1)(B)), and for conspiracy to commit these offenses, in violation of 18 U.S.C. § 371, the general federal conspiracy statute. Olivella was convicted

and sentenced to 41 months in prison. The jury hung regarding Curescu, so he was retried, and this time convicted, and the judge sentenced him to 6 months in prison. We have consolidated their appeals because although the two cases involve different conspiracies, the conspiracies are similar and their memberships overlap.

Catherine Romasanta, the government's key witness against Curescu (she testified against Olivella as well), worked in Chicago as an "expediter"—someone who helps building developers and contractors obtain construction permits from the City. She admitted that between 2004 and 2007 she had bribed between 25 and 30 City employees to overlook violations of the building and zoning codes and to speed up action on permit applications. Apprehended in 2007, she agreed to act as an informant, recording telephone conversations and meetings with her clients (developers and contractors) and City employees.

It was after she became an informant that Curescu hired her to obtain authorization for him to add two residential units to the basement of a building that he owned. The zoning code forbade the addition, so he would have needed an amendment to the code, or a variance, to be able to add the units lawfully. Instead of going either route he became Romasanta's client and agreed to pay her $12,500 for her services. She paid an $8,000 bribe to a zoning inspector for his falsely certifying that the building, with the additional units, was nevertheless in compliance with the zoning code. The bribe

money was supplied to her by the government—she didn't receive her fee from Curescu until after she had paid the bribe. But Curescu, who of course didn't know that Romasanta was working for the government, would have assumed that she had advanced the bribe money, and that the $10,000 fee that he paid her upon receipt of the certification (he had paid her $2,500 earlier) reimbursed her for the advance.

Curescu had now to construct the units. To add the plumbing that was necessary to make them habitable he hired an unlicensed plumber, a code violation. A plumbing inspector discovered the violation and told Curescu to redo the plumbing. Curescu paid an acquaintance, Beny Garneata, a licensed plumber, $7,000, and Garneata in turn paid defendant Olivella, another plumbing inspector, a portion of that amount to certify falsely that a licensed plumber had done the plumbing.

Curescu was charged both with the zoning bribe and the plumbing bribe, but was acquitted of the latter charge, probably because of the possibility, remote as it seems, that Garneata, the actual payor of the bribe, was doing an unsolicited "favor" for Curescu, or, more plausibly, that Curescu thought he was paying Garneata to redo the plumbing but Garneata decided to bribe an official instead; for we'll see that Garneata may have pocketed $6,000 of the $7,000 without doing any plumbing work, paying inspector Olivella only $1,000 to approve the existing plumbing. Convicted of accepting the plumbing bribe, Olivella was not involved in the zoning bribe.

The defendants challenge a variety of the district judge's procedural and evidentiary rulings. We begin with Curescu's challenges.

Remember that Romasanta testified that she'd paid a bribe of $8,000 to enable Curescu to add the two residential units to his building. The judge allowed her also to testify that before she had become an informant she had paid another $8,000 bribe to enable Curescu to add two residential units to another property that he owned, hence $4,000 a unit, just like the bribe for which he was prosecuted. That evidence was admissible under Rule 404(b) of the federal evidence rules because it strengthened the inference that Curescu had known that the money he had paid her for her services as an expediter the second time, when he wanted to add the same number of residential units to a different property, included money for bribing a zoning inspector. But during the trial it became apparent that the first $8,000 bribe had been to enable Curescu to add four units rather than two to that first building. Curescu's lawyer argued to the jury that this showed that Romasanta was a liar and the rest of her testimony should be disbelieved—and, what is more important (for most of her testimony was based on recorded conversations; nor is there any doubt that she in fact bribed zoning and plumbing inspectors with abandon), showed that the "four grand per unit" that Curescu said in one of the recorded conversations that he had paid Romasanta was for obtaining by lawful means the City's authorization to add the four units, rather than being bribe

money. For he had paid her, according to the government, a total of only $14,500. At "four grand per unit" in bribes alone, he would have had to pay her $16,000 and that would have left nothing to compensate her for her time, not to mention for her risking criminal punishment—yet we know from their subsequent transaction that she intended her fee to include compensation for herself, on top of the amount paid in bribes.

Curescu argues that he's entitled to a new trial because the government knew that Romasanta's testimony that she had paid bribes of $4,000 per unit in their first transaction was false. Prosecutors may not use evidence that they know or should know is false to obtain a conviction, *Napue v. Illinois*, 360 U.S. 264, 269 (1954); *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011), and if they do so and there is a reasonable likelihood that the evidence influenced the jury, the defendant is entitled to a new trial. *Id*. at 679. When confronted with the evidence that four units had been involved in the earlier transaction rather than two, Romasanta testified that her recollection was that only two had been involved. This was not necessarily inconsistent with four units' having been involved, because recollections are often mistaken, and Romasanta was a very busy briber. But there's no doubt that the bribe indeed involved four rather than two units, and so her testimony was false; whether it was also perjurious is irrelevant. *Id*. at 680-81.

Not only was her mistake (maybe it *was* a lie) exposed at trial, but given that exposure the error became ammuni-

tion for the closing argument of the defense, as sketched above, and thus may well have helped Curescu rather than hurt him. Even if the government knew of the error before Romasanta testified, yet let her testify, hoping the error would not be caught, an error that doesn't reduce the defendant's likelihood of being acquitted can't be a ground for reversal, because judges are not to use reversal to punish governmental misconduct. *United States v. Hasting*, 461 U.S. 499, 506-07 (1983); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995); *United States v. Derrick*, 163 F.3d 799, 806-07 (4th Cir. 1998); see also *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-56 (1988).

And the fact that Romasanta's fee to Curescu was only \$3,625 a unit for approval of four units (\$14,500 ÷ 4) but \$6,250 per unit for the approval of two (\$12,500 ÷ 2) did not weaken the government's case, though her erroneous testimony did. She may have done much less work to get the first approval, while the risk the building inspector had taken in giving that approval (which would have affected the bribe he would demand) may have been no greater for four units than for two. And so the fact that the bribe per unit was lower the first time would not undermine the inference that Curescu had knowingly been paying bribe money (indirectly through his "expediter") rather than buying a lawful expediting service.

Curescu also complains about the judge's allowing Romasanta to testify about her understanding of statements that he made to her in the recorded conversations.

For example, she testified that when he said "five and five and two," he meant that "he wanted to pay [a maximum of] $5000 per illegal dwelling unit as a bribe," the "two" referring to additional expense she would have to incur to obtain permission for him to add the two units, though in the end she asked for and received $2,500 for that expense. (The question what her compensation would be seems to have been left open. In the end, because she was working for the government, she made no effort to obtain a fee.) Another example is her testimony that when Curescu said "I'll go to what's necessary, but, you know, I don't need to be strangled," she understood him to mean that "he would pay the bribe payment, but he didn't want it to be extremely high."

Curescu argues that it is improper for a witness to testify to what another person is thinking. That's incorrect. *United States v. Locke*, 643 F.3d 235, 240 (7th Cir. 2011); *United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008); *Asplundh Mfg. Division v. Benton Harbor Engineering*, 57 F.3d 1190, 1197-98 (3d Cir. 1995); *United States v. Rea*, 958 F.2d 1206, 1214-15 (2d Cir. 1992). Rule 701(a) of the federal evidence rules allows a lay witness to offer an opinion that is "rationally based on the witness's perception," and though one can't actually read another person's mind, one is often able to infer, from what the person says or from the expression on his face or other body language, what he is thinking. Anyway Romasanta was testifying not to what Curescu actually meant but to what she understood him to

mean, which was probative of what he meant but was based entirely on her mental processes rather than his. Such testimony is unexceptionable, *United States v. Wantuch*, *supra*, 525 F.3d at 515; *United States v. Estrada*, 39 F.3d 772, 772-73 (7th Cir. 1994) (per curiam), even though it implies an opinion about what the speaker was thinking, since such lay opinion testimony is itself, as we said, permissible. *United States v. Garcia*, 291 F.3d 127, 140-41 (2d Cir. 2002).

The testimony about what Romasanta understood Curescu to be referring to was important. Just as dealers in illegal drugs do not name the drugs in their phone conversations but instead use code words, so parties to other illegal transactions often avoid incriminating terms, knowing they may be overheard electronically. So if they're involved in bribery, they don't use the words "bribery," "bribe," or "bribes," *United States v. Maloney*, 71 F.3d 645, 662 (7th Cir. 1995); *United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985); *United States v. Page*, 808 F.2d 723, 726 (10th Cir. 1987); *United States v. Tamura*, 694 F.2d 591, 597 (9th Cir. 1982), but instead use words that the other party to the conversation understands to refer to bribes—without that understanding there would be a failure of communication.

Anyone who's overheard conversations on the street or in a restaurant knows that conversations between strangers are often unintelligible. There is the public language we employ when talking to strangers and the elliptical private language that we use when talking to people whom we know. Strangers need an interpreter,

and a party to the conversation is the obvious choice to be that interpreter. There is no difference between using a private language for the sake of brevity and using it to conceal meaning from strangers—or the authorities. Curescu might as well be arguing that a translator can't testify to the meaning of a statement in a foreign language.

Notice also how damaging Curescu's seemingly innocuous statement that "I'll go to what's necessary, but, you know, I don't need to be strangled" would have been to his defense even if left untranslated. Were he negotiating with Romasanta just over her fee, he would be unlikely to say "I'll go to what's necessary"; "what's necessary" must refer to some necessity imposed on Romasanta by a third party—namely the insistence by the City employee who could alter records that he be paid to do so.

What Curescu didn't say in any of the recorded conversations illustrates that silence like obliquity can be eloquent. He never asked Romasanta what an "expediter" does or what services he was receiving for fees totaling $27,000 that he agreed to pay her with respect to the two properties about which she testified.

Curescu's other objections to the district judge's rulings, such as the judge's refusal to admit evidence that the workmanship used in building the illegal residential units was good (an irrelevance), or the judge's refusal to allow extrinsic evidence to bolster impeachment of Romasanta's testimony by reference to her having testified in a trial of another developer that

she had passed three bribes when actually she had passed only two (a refusal that was a permissible judgment call by the judge), do not merit discussion.

So we turn to Olivella's appeal. Remember that Curescu didn't want to rip out the plumbing that had been installed unlawfully in the new basement apartments (unlawfully because an unlicensed plumber had installed it) and thus have to bear the expense of removing the old plumbing and replacing it, doubtless at greater cost if he used a licensed plumber, as the law required. He turned for help, as we mentioned, to a licensed plumber, Garneata; and in a conversation between Garneata and Olivella (a plumbing inspector, remember), recorded pursuant to a court order, Olivella told Garneata that the plumbing had to be removed and Garneata replied "I really need to help this guy because it's one of my workers' brothers." (Actually a brother-in-law.) Olivella suggested that rather than discuss the matter on the phone they get together to discuss it. In a subsequent call Garneata told Olivella "I take care of you royally, man. I take care of you royally"—and that night Olivella was a guest in Garneata's skybox to watch a Chicago Bulls game. Later Garneata instructed an associate of his to tell Curescu "that it will cost him $7,000, that's how much he [presumably Olivella] wants." The next day Curescu gave $7,000 in cash to Garneata at a Starbucks. Garneata called Olivella and told him he was on his way to his office. Olivella was videotaped entering Garneata's office building shortly afterward. Olivella then certified falsely that the plumbing had

been installed by a licensed plumber and that there were no building-code violations (there were, on top of Curescu's failure to have used a licensed plumber).

The evidence of Olivella's guilt in the plumbing conspiracy was stronger than the evidence of Curescu's guilt in the zoning conspiracy, because in the zoning conspiracy Curescu had paid an "expediter" and argued that he didn't know that part (in fact most) of the money he paid would go to bribe City employees. But in the plumbing conspiracy Garneata, as a favor to Curescu, paid Olivella for what can only have been Olivella's allowing the illegal plumbing in the added residential units to remain.

Although the evidence was adequate to convict Olivella of guilt beyond a reasonable doubt, we don't agree with the statement in the government's brief that "the jury's verdict must stand unless Olivella can show that the jury's 'take on the evidence was wholly irrational,'" quoting *United States v. Hoogenboom*, 209 F.3d 665, 669 (7th Cir. 2000), and adding that showing that a jury verdict was "wholly irrational" is a "nearly insurmountable hurdle." We can't criticize lawyers for quoting from opinions of this court that have not been overruled, but to say that a jury verdict can be set aside only if "wholly irrational" (which would indeed be a "nearly insurmountable" proposition to establish) is the kind of hyperbole that sometimes creeps into opinions (and not just *Hoogenboom*—see, e.g., *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992)), and it should not be considered legal doctrine. A jury verdict

of guilt can be set aside—must be set aside—if, even though the verdict is not "wholly irrational," the evidence would not have justified a reasonable juror in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 317-19 (1979); *United States v. Mojica*, 185 F.3d 780, 789 (7th Cir. 1999); *United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994); *United States v. DeCorte*, 851 F.2d 948, 952 and n. 2 (7th Cir. 1988); *United States v. Brown*, 776 F.2d 397, 402 (2d Cir. 1985) (Friendly, J.). This is a heavy burden, but it is not "nearly insurmountable." That would imply that we rubber stamp guilty verdicts.

The emphasis in the government's brief on the sufficiency of the evidence is unnecessary, because Olivella doesn't challenge its sufficiency as such; rather his argument is that "once th[e] improper propensity evidence is set aside, there simply is not enough evidence from which a jury could have found [Olivella] guilty beyond a reasonable doubt." So let's consider what he calls "propensity evidence." The reference is to evidence of prior bribes that Olivella received. But his brief also attacks the district court's refusal to sever his trial from that of Curescu and to allow him to impeach some of Garneata's recorded statements with extrinsic evidence.

To be guilty of soliciting or accepting a bribe in violation of section 666(a)(1)(B) requires knowing that the money or other thing of value received was indeed a bribe, which is to say an inducement to do a corrupt act. *Salinas v. United States*, 522 U.S. 52, 57 (1997); *United States v. Robinson*, 663 F.3d 265, 271

(7th Cir. 2011); *United States v. Ford*, 435 F.3d 204, 212-14 (2d Cir. 2006). The evidence that Olivella had received three previous cash bribes (plus a $250 gift certificate, a noncash bribe), averaging more than $5,000, for overlooking code violations discovered in plumbing inspections tended to rebut an inference that Olivella had thought the money Garneata paid him was a gift rather than a bribe. The use of evidence of prior crimes to show "absence of mistake" is an express exception to the prohibition of prior-crimes evidence. Fed. R. Evid. 404(b)(2).

Olivella challenges the judge's refusal to sever his trial from Curescu's; remember that they were tried together initially, and Olivella was convicted but the jury couldn't agree about Curescu, and so he was retried and this time convicted. Although the zoning and plumbing conspiracies were different, Curescu was at the heart of both, for both were conspiracies to obtain unlawful benefits for his building. Joinder was therefore proper. Fed. R. Crim. P. 8(b). Olivella's argument for severance is that "after hearing extensive evidence of the zoning conspiracy . . . the jury must have been left with the impression that City Hall and all the inspectors working there were entirely corrupt and deserving of punishment." That is implausible; by the same token one might think that the evidence of the plumbing conspiracy would poison the jury against Curescu, but apparently it didn't because when he was tried together with Olivella the jury hung; only when he was retried by himself was he convicted.

Olivella argues finally that his lawyer should have been allowed, by cross-examination of either a postal inspector or an FBI agent, to elicit a statement made by Garneata to those officers after his arrest that "not everything in the recordings were [*sic*] true," the reference being of course to the recordings the government had made of his phone conversations. We quoted the recorded conversation between Garneata and an associate of his that provided the single most damaging piece of evidence against Olivella ("it will cost him $7,000, that's how much he wants"). Olivella argues that Garneata's statement that "not everything in the recordings were true" was a comment on that phone conversation. He bases this surmise on Garneata's admission (also excluded from the trial) that his statement in the same conversation that the $7,000 was intended for Olivella (probably to be split by Olivella with his boss) was false—he meant to keep most of it for himself, and in fact gave Olivella only $1,000. Yet at trial Olivella's lawyer said he didn't want to get into the evidence of Garneata's admission that he had ripped off Curescu, who "bought" a certification for $7,000 that had actually cost only $1,000.

Garneata's admission does not exonerate Olivella. The crime of which Olivella was accused and convicted was soliciting "anything of value . . . intending to be influenced . . . in connection with any business, transaction, or series of transactions . . . involving any thing of value of $5,000 or more." The fact that Curescu was willing to pay $7,000, whether to redo the plumbing or to avoid having to redo it, indicates that even if Olivella

solicited merely a $1,000 bribe, that bribe was intended to influence a transaction (redoing the plumbing— a transaction the bribe was intended to prevent) that involved value of at least $5,000. Garneata's admission that he paid Olivella "only" $1,000 was actually further evidence of Olivella's guilt.

The government had made some 3,000 recordings of Garneata's phone conversations. Obviously not everything he said in them was true; in fact much must have been false, since many of the conversations concerned his criminal activities, about which he would have been devious at best. We can't see what proper use Olivella could have made of the statement, amounting to a truism, that "not everything in the recordings were true," in the absence of evidence—and there is none—that Garneata had been referring to the recorded conversation ("it will cost him $7,000, that's how much he wants") that was so helpful to the prosecution.

AFFIRMED.