# United States Court of Appeals
## For the First Circuit

No. 19-2013

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS REYES, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Thompson and Kayatta, <u>Circuit Judges</u>,
and Katzmann,[*] <u>Judge</u>.

<u>Leslie Feldman-Rumpler</u> for appellant.
<u>Karen L. Eisenstadt</u>, Assistant United States Attorney, with whom <u>Nathaniel R. Mendell</u>, Acting United States Attorney, was on brief, for appellee.

January 19, 2022

---

[*] Of the United States Court of International Trade, sitting by designation.

**KATZMANN**, **Judge**.  A jury convicted defendant Carlos Reyes, Jr. ("Reyes") of one count of conspiracy to possess with intent to distribute and to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1).  Defendant now appeals, asserting error by the district court.  Before us are claims that: (1) evidence obtained during a traffic stop should have been suppressed; (2) the district court erroneously admitted certain statements of lay witnesses that unfairly prejudiced the defendant; (3) the proceedings contravened the defendant's statutory and constitutional rights to a speedy trial; and (4) the defendant's absence at certain pre-trial proceedings violated his statutory and constitutional presence rights.  We affirm.

## I.   Background

### A.   Facts

"We state the facts in the light most favorable to the verdict."  United States v. Vega-Figueroa, 234 F.3d 744, 747 (1st Cir. 2000) (citing United States v. Duclos, 214 F.3d 27, 32 (1st Cir. 2000)).  Because "[m]any of the facts pertaining to particular issues will be set forth in our discussion of the issues[,] [a]ll we do now is state those facts that will give the reader the necessary background information to understand the

different issues raised by defendant." Id. at 748.

In 2016, the United States Postal Inspector Service and the Massachusetts State Police began investigating a potential drug distribution conspiracy that law enforcement assessed was using the mail to transport controlled substances from Puerto Rico to Massachusetts. Investigators became suspicious after observing packages bearing characteristics common to drug conspiracies, namely parcels with: fictitious sender information (either a fake sender name or undeliverable return address, or both); deliverable, but slightly incorrect addresses for recipients; postage paid in cash; and handwritten mailing labels all in the same handwriting but listing different senders' names.

After additional investigation, law enforcement identified Pablo Santiago-Cruz ("Santiago-Cruz") as the conspiracy's central figure and Reyes as a "runner" who received some of the drug shipments from Puerto Rico and then transferred their contents to Santiago-Cruz. Of the more than thirty suspicious parcels identified as part of the conspiracy, seven were identified as addressed to Reyes; five of these packages were delivered as "controlled deliveries" executed under law enforcement surveillance.

Through these controlled deliveries and corresponding surveillance, law enforcement observed that on three occasions, shortly after Reyes took delivery of the packages, Santiago-Cruz

either came to Reyes's house or Reyes traveled to meet Santiago-Cruz; on two of these occasions, law enforcement observed Reyes carrying bags consistent with the size and shape of cocaine. Additionally, telephone records obtained by investigators revealed that on days parcels were shipped from Puerto Rico and delivered in Massachusetts, Santiago-Cruz and Reyes had multiple telephone contacts.

On July 18, 2016, the investigative team carried out the final controlled delivery that led to Reyes's arrest. At around 12:30 p.m., a postal inspector dressed as a mail carrier left the controlled parcel addressed to Reyes at 45 Winthrop Street in Framingham -- Reyes's correct address was in fact 47 Winthrop Street -- on the shared porch of Reyes's duplex at 45-47 Winthrop Street. Approximately ten minutes later, an unidentified person came out and carried the parcel into 47 Winthrop. Reyes returned home that night at around 7:00 p.m. and reemerged from his house approximately ten minutes later carrying the parcel. Law enforcement saw Reyes walk down his driveway to an out-of-sight area behind the house and shortly thereafter observed Reyes pulling into the street in his car.

Once mobile, members of the investigative team surreptitiously followed Reyes for approximately thirty minutes, driving in a "stack" of eight to ten unmarked vehicles and one State Police cruiser. Trooper Dennis Lynch ("Trooper Lynch"), of

the Massachusetts State Police, -- who had been involved in surveillance of some of the prior controlled deliveries to Reyes -- drove the police cruiser.  After another trooper in the "stack" -- Trooper Keith Pantazelos -- conveyed over the radio that he had observed Reyes tailgating, and after Trooper Lynch "clocked" Reyes speeding, Trooper Lynch initiated a traffic stop of Reyes.  As Trooper Lynch pulled Reyes over to the side of the road, Trooper Pantazelos and the other officers in the unmarked vehicles continued driving to a nearby parking lot where they could covertly monitor the traffic stop from a distance.

In order to avoid alerting Reyes to the larger drug investigation, Trooper Lynch approached Reyes as if he were conducting an ordinary traffic stop.  Accordingly, Trooper Lynch began by asking Reyes routine traffic-related questions through the driver's side window, such as where Reyes was going; Reyes could not identify his destination beyond "Boston".  As the conversation proceeded, Reyes acknowledged to Trooper Lynch that he had previously served a 188-month sentence in a federal narcotics case, and Trooper Lynch knew -- from his involvement in the overarching drug investigation -- that Reyes had prior convictions for firearms and assault, including assault and battery on a police officer.  Throughout their conversation, Trooper Lynch observed that Reyes was extremely nervous and was crumpling something in his left hand, which Trooper Lynch thought

at the time was cocaine. Upon inquiry, Reyes told Trooper Lynch that it was a shipping label from a package with his name on it; when Trooper Lynch asked for and took possession of the label, he identified it as the Priority Mail label from that day's controlled delivery.

Trooper Lynch proceeded to ask Reyes for his consent to search the car for drugs and weapons, which Trooper Lynch testified -- and the district court found -- that he received. In order to conduct the search, Trooper Lynch asked Reyes to exit his vehicle, at which point, Trooper Lynch escorted him to the front of the car. After conducting a brief scan of the immediate driver's area, Trooper Lynch called for a canine team to assist. Trooper Lynch testified -- and the district court found -- that as he waited for the K-9 unit to arrive, Trooper Lynch reconfirmed Reyes's consent to the search.

Once the canine team -- consisting of Trooper William McSweeney and his dog -- arrived, Trooper Lynch handcuffed Reyes and placed him in the back-passenger seat of his police cruiser for the duration of the dog's search. Trooper Lynch informed Reyes that he was not under arrest and that these measures were just for safety. The dog then commenced its search; at some point surrounding the dog's search, a third trooper -- Trooper Daniel Mahoney -- arrived on the scene. After the dog finished searching the passenger areas of the car, Trooper McSweeney opened the car's

trunk and the dog jumped into it; the dog "alerted on" a box containing a Girl Scout Cookie Oven, which the Troopers removed from the trunk.

Prompted by the discovery of the Girl Scout Cookie Oven box, Trooper Lynch asked Reyes if he "ha[d] kids," to which Reyes replied that he had a nineteen-year-old daughter. When Trooper Lynch expressed skepticism that a nineteen-year-old would want a Girl Scout Cookie Oven, Reyes claimed the oven was for his two-year-old niece. When Trooper Lynch expressed further skepticism that a Girl Scout Cookie Oven was an appropriate toy for a two-year-old, Reyes said that a girl had given him the box and that he did not know what was inside of it.

Trooper Lynch picked up the Girl Scout Cookie Oven box and assessed that it felt heavier than a toy oven. Accordingly, Trooper Lynch opened the box and took out the actual oven. After reconfirming his assessment that the Girl Scout Cookie Oven felt heavier than a toy, Trooper Lynch peeled open the plastic top of the oven and found what he believed to be -- and what was later confirmed to be -- a kilogram of cocaine inside it. Trooper Lynch returned to Reyes, informed him of what the dog had found, and placed him under arrest. Trooper Lynch read Reyes his Miranda

rights[1] at that time.

On July 19, 2016, law enforcement executed search warrants of Santiago-Cruz's and Reyes's residences. Agents found drugs, drug paraphernalia, and a quantity of U.S. currency at Santiago-Cruz's residence and the discarded parcel box from the July 18 controlled delivery with its mailing label removed in Reyes's trash.

## B.    Proceedings

On August 31, 2016, a federal grand jury returned an indictment charging Reyes with one count of conspiracy to possess with intent to distribute and to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1).

On September 25, 2017, Reyes made a pre-trial motion to suppress the physical evidence seized from his vehicle as well as the statements he made to Trooper Lynch during the stop on July 18, 2016.  Reyes argued that the physical evidence should be suppressed because there was no valid basis for the stop and search -- as he neither committed any traffic violations to justify the

---

[1] Before a suspect is subjected to "custodial police interrogation," an "accused must be adequately and effectively apprised of his [Miranda] rights," which include the right to remain silent. Dickerson v. United States, 530 U.S. 428, 440 (2000) (quoting Miranda v. Arizona, 384 U.S. 436, 467 (1966)).

initial stop nor did he consent to the search -- and that his statements should be suppressed because the stop was a de facto arrest that required Miranda warnings.[2]

Following an evidentiary hearing on January 10, 2018, the district court denied Reyes's motion to suppress on April 9, 2018. Of relevance to Reyes's current appeal, the district court made the following findings: (i) Reyes committed traffic violations of tailgating and speeding, which justified the initial traffic stop; (ii) Reyes twice voluntarily consented to the search of his car; (iii) the "justified investigatory stop" did not become a de facto arrest -- even after Reyes was handcuffed -- where Trooper Lynch was "effectively alone" in attending to the defendant throughout the stop; and (iv) the entire stop prior to arrest lasted approximately twenty-six minutes, with Reyes in handcuffs but not arrested, for nineteen of those minutes.

Trial began on September 24, 2018. At trial, Reyes's defense focused on the Government's lack of evidence that he was aware of the contents of the package seized from his car during the July 18 stop. During the proceedings, Reyes objected to certain statements given by Government witnesses, Trooper Lynch and United States Postal Inspector Stephen Dowd. Of relevance to

_____

[2] "[T]he admissibility in evidence of any statement given during [a] custodial interrogation of a suspect . . . depend[s] on whether the police provided the suspect with [Miranda] warnings." Dickerson, 530 U.S. at 435.

Reyes's current appeal, the trial court overruled Reyes's objections to statements by Trooper Lynch that: (i) past narcotics investigations in which Trooper Lynch had been involved typically resulted in arrests for narcotics violations; (ii) Reyes drove like "[h]e knew where he was going" on the day of the July 18, 2016 traffic stop; and (iii) Reyes "was trying to make up a story [about] where he was going" while responding to Trooper Lynch's questions during the stop; the trial court also overruled Reyes's objections to Inspector Dowd's lay testimony that the labels on the parcels addressed to Reyes and others appeared to have common authorship based on the similarity in handwriting.

Upon conclusion of the trial, the jury returned a verdict finding Reyes guilty on both counts. The district court sentenced Reyes to 210 months of imprisonment on each count to run concurrently and forty-eight months of supervised release.

Reyes timely lodged this appeal.

## II.  DISCUSSION

We have jurisdiction under 28 U.S.C. § 1291.[3] We review the district court's findings of fact for clear error and accept all reasonable inferences that it has drawn. See United States

---

[3] 28 U.S.C. § 1291 provides in pertinent part:

> The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States. . . .

v. Coombs, 857 F.3d 439, 445-46 (1st Cir. 2017) (first citing United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994); then citing United States v. Paneto, 661 F.3d 709, 711 (1st Cir. 2011)). We review the district court's legal conclusions de novo. United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014) (citing Ornelas v. United States, 517 U.S. 690, 691, 699 (1996)).

## A.  Suppression Ruling

First, Reyes challenges the district court's pre-trial ruling denying his motion to suppress evidence. Specifically, he challenges the admission of physical evidence collected as a result of the search of his vehicle -- namely, the cocaine recovered from the closed Girl Scout Cookie Oven box in the trunk -- and the admission of statements made by Reyes while he was stopped prior to being advised of his Miranda rights. On appeal, Reyes argues that the district court's denial order was flawed because the order: (i) relied on two clearly erroneous findings of fact; and (ii) did not reflect the Supreme Court's guidance in Rodriguez v. United States, 575 U.S. 348 (2015). We reject both contentions.

When reviewing a suppression ruling, we consider the "evidence in the light most favorable to the suppression ruling" and can affirm "on any basis apparent in the record." Arnott, 758 F.3d at 43. As noted, we review the district court's findings of fact for clear error and "the court's legal conclusions, including its answers to 'the ultimate questions of reasonable suspicion and

probable cause to make a warrantless search[]' de novo."  Id. (emphasis added) (quoting Ornelas, 517 U.S. at 691).  Similarly, when reviewing "whether [a] defendant[] w[as] 'in custody' for Miranda purposes," we review factual questions for clear error and the ultimate legal question de novo.  United States v. Campbell, 741 F.3d 251, 265 (1st Cir. 2013) (citing United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)).  "Given the textured nature of these inquiries," we will "proceed circumspectly and with regard for the district court's superior vantage point."  United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007) (citing Zapata, 18 F.3d at 975).

### 1.   The District Court's Factual Findings

As has been noted, the district court declined to suppress the physical evidence obtained during the stop, finding that Reyes voluntarily consented to the search of his vehicle.  In addition, the district court declined to suppress the statements made by Reyes during the execution of the search because the court found that the investigatory detention was not transformed into a de facto arrest by anything that transpired during the stop -- including the handcuffing of Reyes where Trooper Lynch was "effectively alone" in attending to him.  Reyes contests the district court's factual findings that he consented to the search of his vehicle and that Trooper Lynch was "effectively alone" in dealing with Reyes.

### a.    __The Consent Finding__.

The district court, while noting that "[t]here is a difference between giving consent happily and giving it voluntarily," concluded that Reyes twice voluntarily consented to the search of his vehicle and that "the actual search [conducted] did not exceed the scope of [the] consent that was given."  In making these findings, the court relied largely on the testimony of Trooper Lynch, who the court deemed to be credible.  Because, as the district court explained, "[i]t is well-established that 'a warrantless search may be conducted with the voluntary consent of a person authorized to give it,'" (quoting United States v. Stierhoff, 549 F.3d 19, 23 (1st Cir. 2008)), the court ruled that both the warrantless search of Reyes's car and the admission at trial of the physical evidence seized therein were permissible.

On appeal, Reyes objects to the fact that the district court's finding of consent was based solely on the "uncorroborated" testimony of Trooper Lynch.[4]  Reyes argues that the district court's assessment that Trooper Lynch was credible was belied by the lack of any contemporaneous record of Reyes's consent and assessed inconsistencies in Trooper Lynch's affidavit and oral

---

[4] In this overarching challenge, Reyes contests the finding that he consented to the search at all; he has not lodged alternative challenges to the district court's subsidiary conclusions that such consent: (i) was voluntary and (ii) encompassed a search of the car's trunk.

testimony.  These arguments are unavailing.

Typically, consent -- including its voluntariness -- "turns on questions of fact" that must be assessed based upon "the totality of the circumstances."  United States v. Fornia-Castillo, 408 F.3d 52, 62 (1st Cir. 2005).  "For that reason, a finding of voluntary consent . . . is reviewable only for clear error."[5]  Id. "Where a district court's factual findings" -- such as a consent finding -- "are based on credibility determinations[,] . . . error is seldom considered 'clear' unless the credibility assessments were based on testimony which was inherently implausible, internally inconsistent, or critically impeached."  United States v. Merlino, 592 F.3d 22, 27 (1st Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting Awon v. United States, 308 F.3d 133, 141 (1st Cir. 2002)).  Reyes has not made the requisite showing.

Reyes's initial contention -- that the lack of any contemporaneous record of Reyes's consent belies Trooper Lynch's credibility -- is unpersuasive.  The lack of such records is consistent with Trooper Lynch's evidentiary hearing testimony that troopers generally do not create audio recordings of consent or use consent forms at stops.  Moreover, we have previously considered and rejected the argument that a lack of contemporaneous

---

[5] Unless the finding of consent is based on an erroneous legal standard.  Fornia-Castillo, 408 F.3d at 62.

records evidencing a defendant's consent undermines the credibility of a government agent. See United States v. Meléndez-Santiago, 644 F.3d 54, 61 (1st Cir. 2011) (where the district court "afford[ed] total credibility" to a government agent's testimony that defendant Meléndez voluntarily confessed to his role in a conspiracy and agreed to cooperate, the Government's "fail[ure] to produce a signed waiver, a cooperative agreement, a recording of the interviews, or a signed statement from Meléndez d[id] not establish inherent implausibility or other basis for a finding of clear error" (internal citation omitted)).

Nor has Reyes succeeded in proving that Trooper Lynch's narrative regarding Reyes's consent was inherently implausible on its own terms. We disagree with Reyes's contention that there was "no reason" for Trooper Lynch to ask for consent a second time after Reyes had already consented to the search a few minutes prior; after all, this was a pre-planned stop. Given the expectation that the stop would produce evidence, it is logical that Trooper Lynch would seek to protect the search by reconfirming Reyes's consent. Although, as Reyes suggests, it might have made more sense for Trooper Lynch to request consent a second time once other officers -- who could serve as witnesses to the consent -- had arrived on scene, it is not our role to decide whether Trooper Lynch acted optimally in securing Reyes's consent, but rather to assess whether his account is credible. Because Reyes has not

shown that Trooper Lynch's consent narrative is inherently implausible or inconsistent, we will not overturn the district court's consent finding on such grounds.

Reyes's additional attacks on the district court's assessment of Trooper Lynch's credibility are, likewise, unsuccessful. Reyes contends that there were several inconsistencies in Trooper Lynch's written and oral statements on matters unrelated to the consent issue that show that Trooper Lynch is such an incredible witness overall that his testimony on the question of consent should, correspondingly, not be believed. Because the Government offers a persuasive rebuttal to each of Reyes's contentions, Reyes again fails to satisfy his burden of proving that the district court's credibility determination was clearly erroneous.

Reyes first points to the fact that the Government asked the district court to disregard in deciding the motion to suppress the statement in Trooper Lynch's affidavit that he learned from fellow officers that Reyes arrived at his home on the day of the traffic stop at approximately 7:00 p.m. and that soon thereafter Reyes placed a box taken from the suspicious parcel into the trunk of his car and drove away. While Reyes suggests that the Government's request itself reveals that Trooper Lynch is not credible, the Government explained in its closing argument on the motion to suppress that its request was motivated by the fact that

certain predicate observations did not come into evidence at the evidentiary hearing. The Government made clear both that its request did not stem from any conceded inaccuracy or dishonesty on the part of Trooper Lynch, and that it was not asking the district court to ignore Trooper Lynch's testimony at the hearing. The Government was merely moving to withdraw aspects of the affidavit that were not elicited during the evidentiary hearing.

Second, Reyes argues that Trooper Lynch's testimony about the traffic violations committed by Reyes was "inconsistent and dubious." Specifically, Reyes takes issue with Trooper Lynch's claim on direct examination that he personally observed Reyes tailgating. Reyes claims that on cross-examination, Trooper Lynch changed his testimony about where in the "stack" of officer vehicles he was in relation to Reyes and admitted that it was in fact Trooper Pantazelos who observed the tailgating, while Trooper Lynch learned of this traffic violation via radio transmission. Contrary to Reyes's contention, there is no ipso facto inconsistency. As the Government explained in oral argument, tailgating is not necessarily an instantaneous phenomenon that only one person can observe. Common sense dictates that if a driver is tailgating over a period of time, two people could see it. Thus, it could be simultaneously true that Trooper Lynch first learned of Reyes's tailgating via the radio transmission of Trooper Pantazelos and also observed the tailgating for himself

- 17 -

when he eventually moved into position behind Reyes in the State Police cruiser. As such, Trooper Lynch's testimony on the traffic violations is not inherently implausible or inconsistent such that the district court's credibility determination should be disturbed. See Merlino, 592 F.3d at 27.

Finally, Reyes contends that because Trooper Lynch's testimony on "how long . . . Reyes was in handcuffs before being questioned was different from that in his affidavit and at odds with [Massachusetts State Police] records," he is an incredible witness. Contrary to Reyes's assessment, Trooper Lynch's statement in his affidavit that Reyes was in handcuffs for ten minutes prior to his arrest is consistent with his testimony at the evidentiary hearing that it was approximately ten to fifteen minutes. Ignoring the fact that the district court found that Reyes was handcuffed for around nineteen minutes before his arrest, on appeal, Reyes invokes Trooper Lynch's evidentiary hearing testimony that he stopped Reyes at 7:40 p.m. and an Administrative Journal Extract that reads "20.20" to suggest that Reyes was actually in handcuffs for approximately 35 minutes. For his part, when asked at the evidentiary hearing, Trooper Lynch testified that the entry "20.20" did not mean 8:20 p.m., but rather was "just a number" assigned to the extract, unrelated to time. Thus, Reyes has not identified any inconsistencies in Trooper Lynch's testimony on the handcuffing, as Trooper Lynch has been entirely

consistent in his estimates and explanations.[6]

In short, Reyes's multifaceted attacks on the credibility of Trooper Lynch are insufficient to show that the district court clearly erred in holding that Reyes consented to the search of his vehicle. We, therefore, affirm the factual finding that Reyes twice consented to the search.[7]

b. **The "effectively alone" Finding**.

The district court found -- in part -- because Trooper Lynch was "effectively alone" in attending to Reyes throughout the stop, that Trooper Lynch's use of handcuffs "was reasonably

---

[6] Moreover, Reyes has not succeeded in proving that Trooper Lynch's testimony was inherently implausible. While there may be some appeal to Reyes's contention that the label "20.20" on the Administrative Journal Extract translated to 8:20 p.m. such that a court could find that Reyes was in handcuffs for 35 minutes, that argument was presented to and rejected by the district court; instead, the trial court apparently chose to credit Trooper Lynch's testimony that the entry "20.20" did not represent a time and that the other times recorded in the Administrative Journal Extract were inaccurate. Because "a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous," United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003) (citing United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000)), Reyes has not satisfied his burden and we must respect "the district court's superior vantage point" on this matter, Espinoza, 490 F.3d at 46 (citing Zapata, 18 F.3d at 975).

[7] As previously stated, in light of its finding of consent, the district court further ruled that both the warrantless search of Reyes's car and the admission at trial of the physical evidence seized therein were permissible. In our forthcoming discussion regarding Reyes's argument that the district court's denial order did not reflect Supreme Court guidance, as embodied in Rodriguez v. United States, 575 U.S. 348 (2015), we reject Reyes's Rodriguez-based contention and affirm these additional consent rulings of the district court. Infra p. 21-32.

- 19 -

necessary" to mitigate legitimate safety concerns presented by the specific facts and circumstances of the stop. More broadly, the district court assessed that nothing that transpired during the stop -- including the handcuffing of Reyes -- transformed the investigatory detention of Reyes into a de facto arrest in which administration of Miranda rights was necessary. Accordingly, as Mirandization of Reyes was not required, the District Court found Reyes's statements made during the execution of the search to be admissible.

On appeal, Reyes argues that because on-the-scene officers outnumbered Reyes during the stop and because additional officers covertly monitored the stop from a parking lot nearby, the district court's "finding that Trooper Lynch was 'effectively alone' cannot survive appellate review even under the deferential clear error standard." While Reyes raises a nonfrivolous challenge to the district court's "effectively alone" finding, ultimately, we must ask what the impact of any such finding of clear error would be: Would it transform the detention of Reyes into a de facto arrest, such that Reyes's statements were improperly admitted at trial given the lack of Miranda warnings?

Of particular -- and dispositive -- note, Reyes does not articulate such an argument on appeal; the most he says is that the district court's order denying his motion to suppress relied on the erroneous finding of fact that Trooper Lynch was

"effectively alone" during the stop without referencing Miranda, let alone explaining the broader admissibility consequences of such a factual error. It cannot be said that these admissibility consequences are inherent in Reyes's "effectively alone" contention such that explicit argumentation is unnecessary, and "[w]e [do] not consider potentially applicable arguments that are not squarely presented in a party's appellate brief," Baybank-Middlesex v. Ralar Distribs., Inc., 69 F.3d 1200, 1203-04 n.5 (1st Cir. 1995) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)). A litigant must "'spell out [his] arguments squarely and distinctly,' or else forever hold [his] peace." Zannino, 895 F.2d at 17 (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)).

Because we find that Reyes has waived the broader admissibility argument, we conclude that, even assuming arguendo error in the district court's "effectively alone" finding, that error is of no consequence. At least on the basis argued by Reyes, we discern no reason to disturb the district court's decision denying the motion to suppress Reyes's statements made during the stop.

## 2. **Reyes's Rodriguez Argument**

The district court found that the Government met its burden of establishing that the stop and warrantless search of Reyes were reasonable under the Fourth Amendment. On appeal,

Reyes argues that the district court's denial order was flawed because the court did not adhere to the Supreme Court precedent, Rodriguez v. United States, where the Court was clear that police may not prolong a traffic stop to conduct a dog sniff unless the officer has "the reasonable suspicion ordinarily demanded to justify detaining [the] individual." 575 U.S. 348, 353-55 (2015). By the defendant's assessment, Rodriguez illuminates that the stop of Reyes "became an unreasonable search and seizure in violation of the Fourth Amendment when Trooper Lynch detoured from the mission of traffic enforcement in pursuit of evidence to further an unrelated criminal investigation without reasonable suspicion." We are unpersuaded by Reyes's Rodriguez argument.

### a. Waiver.

As a threshold matter, the Government argues that because Reyes (i) never raised a Rodriguez-based suppression argument to the district court and (ii) made no attempt on appeal to show "good cause" for the delay in raising it, the argument is waived.[8]  While Reyes acknowledges that he did not specifically

_____

[8] Fed. R. Crim. P. 12(b)(3)(C) enumerates "suppression of evidence" as a motion that must be made before trial.  Fed. R. Crim. P. 12(c)(3) further specifies that "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely."  However, "a court may consider the defense, objection, or request if the party shows good cause."  While there is a circuit split as to whether defendants may still receive plain error review for Rule 12 arguments not made before the district court, see United States v. Lindsey, 3 F.4th 32, 41 n.6 (1st Cir. 2021) (collecting cases), we have recently clarified that in the

invoke the Rodriguez case by name in the district court, he nevertheless contends this does not mean that he waived the argument that the traffic stop morphed into an unconstitutional search for drug evidence. Even assuming Reyes's argument below was sufficient to preserve this issue, we nonetheless find that the stop accords with the requirements of Rodriguez.

The essence of Reyes's Rodriguez-centered argument on appeal is that accepting the district court's finding that Reyes violated the traffic laws -- and the corresponding conclusion that the stop was initially justified -- the stop became an unconstitutional seizure "when Trooper Lynch detoured from the mission of traffic enforcement in pursuit of evidence to further an unrelated criminal investigation without reasonable suspicion." We adopt, arguendo, Reyes's contention that the core of this argument was articulated in his initial Memorandum in Support of Motion to Suppress, which read in part: "[L]aw enforcement lacked reasonable suspicion -- let alone the more stringent standard of probable cause -- to believe that Reyes or [his car] were involved in drug-related activity" and "nothing that occurred during the traffic stop provided law enforcement probable cause to search the

---

First Circuit, unpreserved arguments under Fed. R. Crim. P. 12(b)(3) and (c)(3) "cannot be raised on appeal absent a showing of good cause," id. at 40-41, and parties are "not entitled to plain error review," id. at 42.

vehicle."[9]

We proceed to consider and reject Reyes's argument on the merits.

### b.  **Merits**.

The district court found that both the stop and warrantless search of Reyes were reasonable under the Fourth Amendment and, thus, declined to suppress the items seized from the vehicle.  While we agree with the district court's ultimate conclusion, our rationale is slightly different from that articulated in the suppression decision.  "[W]e are not wed to the district court's reasoning but, rather, may affirm its suppression rulings on any basis apparent in the record."  Arnott, 758 F.3d

---

[9] Reyes's Memorandum in Support of Motion to Suppress further read:

That the [car] was purportedly involved in a traffic violation, which Reyes denies (see Reyes Aff., attached hereto as Ex. B), was not sufficient to provide law enforcement with probable cause to search the vehicle. See [California v.] Acevedo, 500 U.S. [565,] 569-570 [(1991)] ("If the officer goes beyond a brief investigatory stop and actually searches or seizes a vehicle in the absence of a warrant, the officer must have 'probable cause to believe that the vehicle contain[s] evidence of crime in the light of an exigency arising out of the likely disappearance of the vehicle.'") Nor was the fact that Reyes was nervous an adequate reason to search the [car]. See United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) (holding that there was not reasonable suspicion to justify pat frisk of defendant solely based upon the dangerousness of the neighborhood and the defendant's "nervous demeanor," as "[n]ervousness is a common and entirely natural reaction to police presence. . . .").

at 43. Accordingly, in affirming here, we supplement the analysis in the denial order, which did not consider the Rodriguez argument Reyes now presses expressly.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10 (1996). "[W]here the police have probable cause to believe that a traffic violation has occurred," "the decision to stop an automobile is reasonable" under the Fourth Amendment, id. at 810, and a police investigation of that violation is justified, Rodriguez, 575 U.S. at 354. While "[a] traffic stop is a 'relatively brief encounter' intended to 'address the traffic violation that warranted the stop,'" United States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021) (quoting Rodriguez, 575 U.S. at 354), it is well-established that "where there is reasonable suspicion of further criminal wrongdoing," id. (citing United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003)), an officer may use a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime, United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (citing Whren, 517

- 25 -

U.S. at 810). However, where "a seizure is 'justified only by a police-observed traffic violation,' officers may not prolong a stop [to investigate another crime] 'absent the reasonable suspicion ordinarily demanded to justify detaining an individual.'" Cruz-Rivera, 14 F.4th at 46-47 (quoting Rodriguez, 575 U.S. at 350, 355).

In the case at bar, the district court explained that because it found "as a factual matter that [Reyes] did commit traffic violations," "[t]his gave Trooper Lynch probable cause to stop [Reyes] for those traffic violations even if doing so was 'just an excuse to investigate something else.'" Accordingly, the stop was reasonable under the Fourth Amendment. Furthermore, because the district court found that Reyes "voluntarily consented to the search of his vehicle, including the trunk," it held "the search was reasonable under the Fourth Amendment." Having found that Reyes gave voluntary consent, the district court held there was "no need to address whether law enforcement had probable cause to conduct the warrantless search."

Supreme Court case law indicates that an additional link is needed. For example, the Court explained in Illinois v. Caballes, that even when a traffic stop is based on probable cause -- as the district court found the stop of Reyes to be in light of his tailgating and speeding violations -- "a seizure that is lawful at its inception can [ultimately still] violate the Fourth

Amendment." 543 U.S. 405, 407 (2005). Specifically, tasks not related to the traffic mission, such as "[o]n-scene investigation into other crimes," are "unlawful" if they prolong the stop absent independent reasonable suspicion. Rodriguez, 575 U.S. at 355-57. Here, without Rodriguez squarely invoked before it, the district court did not -- or at least did not explicitly -- find that independent reasonable suspicion existed to justify extending the stop of Reyes beyond an investigation of traffic violations into an investigation of unrelated drug crimes.

This lack of an explicit independent reasonable suspicion finding complicates the district court's conclusion that Reyes's consent validated the search of his vehicle. In Florida v. Royer, the Supreme Court affirmed that because "the bounds of an investigative stop had been exceeded" at the time that the defendant Royer gave consent to search his luggage, Royer's consent was "tainted by . . . illegality" and therefore "ineffective to justify the search." 460 U.S. 491, 501, 507-08 (1983). Importantly, the Court clarified that "had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion," id. at 502, or while he was not yet seized, id. at 503-05, "the products of the search would be admissible against him," id. at 502.

In Reyes's case, there is no question that he was seized at the time he gave his consent to the vehicle search. Whren, 517

- 27 -

U.S. at 809-10 ("Temporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment].").

Thus, applying Royer and Rodriguez, in order for Reyes's consent to have been effective to justify the search of his vehicle, Reyes must have been legally detained at the time such consent was given -- either because Trooper Lynch was still in the process of completing tasks related to the valid traffic mission[10] or because independent reasonable suspicion justified extending the stop beyond the investigation of traffic violations. Again, without Rodriguez squarely presented, the district court did not consider whether independent reasonable suspicion was necessary to extend the stop, but instead declared that because Reyes's consent had blessed the search, it was unnecessary to address whether law enforcement also had probable cause for that search. Consequently, because the district court did not explicitly find that Reyes's detention continued to be lawful at the time he gave his consent, it is not clear from the denial order that Reyes's

---

[10] We note that the Supreme Court has declared that "a dog sniff is not fairly characterized as part of [an] officer's traffic mission." Rodriguez, 575 U.S. at 356. Thus -- in the absence of independent reasonable suspicion justifying extension of the traffic stop into investigation of other crimes -- the traffic stop of Reyes would, at a minimum, become unlawful at the commencement of the canine search of Reyes's vehicle. We ultimately conclude that law enforcement here had the requisite independent reasonable suspicion to extend the stop. Infra p. 30-32.

consent was valid to justify the search.

We note that in Rodriguez, the Supreme Court did not definitively rule out the possibility that independent reasonable suspicion of additional criminal wrongdoing existed to justify detaining Rodriguez beyond the completion of the traffic investigation, but rather left that question open for the Eighth Circuit's consideration on remand. 575 U.S. at 358. Here too, the district court did not rule on whether independent reasonable suspicion existed to justify extending the traffic stop. Of course, "the general rule is that a 'federal appellate court does not consider an issue not passed on below,'" N.H. Motor Transp. Ass'n v. Flynn, 751 F.2d 43, 52 (1st Cir. 1984) (quoting Singleton v. Wulff, 428 U.S. 106, 120 (1976)), however, the Supreme Court has instructed:

> The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. . . . Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below.

Id. (alteration in original) (quoting Wulff, 428 U.S. at 121). Because we review district courts' legal conclusions on reasonable suspicion de novo, Arnott, 758 F.3d at 43 (emphasis added), and because we assess that we would not be materially aided by additional fact or credibility findings by the district court, we

- 29 -

deem remand unnecessary here. Compare Rodriguez, 575 U.S. at 358, with United States v. Berryman, 717 F.2d 651, 663 (1st Cir. 1983) (Breyer, J., dissenting) (making a first-instance finding of reasonable suspicion on appeal), and United States v. Berryman, 717 F.2d 650, 650 (1st Cir. 1983) (en banc) (adopting the dissent upon rehearing en banc). We now consider whether independent reasonable suspicion existed to extend the stop of Reyes.

"No simple, mechanical formula tells us what reasonable suspicion is, though we know that it is less than probable cause and more than a naked hunch. . . . [C]ourts must gauge its presence in a commonsense, case-by-case way, taking in the whole picture." Cruz-Rivera, 14 F.4th at 43 (alteration in original) (quoting McGregor, 650 F.3d at 821). Considering the "totality of the circumstances," id. at 44, we find that Trooper Lynch had sufficient independent reasonable suspicion of additional criminal wrongdoing to support his continued detention and questioning of Reyes.

We are informed by our recent opinion in Cruz-Rivera, in which we affirmed a finding of independent reasonable suspicion on the basis of similar factual elements to those presented here. 14 F.4th at 44-47. In Cruz-Rivera, as part of a larger, ongoing investigation into a heroin distribution conspiracy, law enforcement executed a "walled-off" stop in which the police pulled over the defendants for a pretextual -- though valid -- traffic

violation with the aim of furthering the drug investigation. Id. at 40. We found that the valid traffic violation justified the initial stop, id. at 44, and moreover, that the officer executing the stop had independent reasonable suspicion to extend the investigative detention beyond the initial traffic infractions into possible drug crimes given: (i) the trooper's pre-existing knowledge that the vehicle had likely been involved in a drug transaction; and (ii) the defendants' noticeable nervousness and inconsistent answers upon police questioning, id. at 44-47.

Similarly, here, law enforcement identified Reyes as a suspected participant in a drug distribution conspiracy via an ongoing investigation that began in February 2016. On July 18, the investigative team carried out a controlled delivery of drugs to Reyes and targeted Reyes for a "walled-off" traffic stop at a time in which the surveillance team believed Reyes would be transporting the drugs. Trooper Lynch -- a member of the investigative team -- executed the "walled-off" stop after Reyes committed traffic violations of speeding and tailgating. On appeal, Reyes accepts the district court's finding that at least one traffic violation occurred, justifying the initial stop. During questioning, Trooper Lynch, who "knew more about Mr. Reyes than [he] let on to believe," observed that Reyes was both extremely nervous -- his hands were shaking -- and was unable to provide basic details on his professed destination beyond

"Boston". Moreover, Trooper Lynch saw that Reyes was crumpling a shipping label in his left hand, which Trooper Lynch confiscated and identified as the Priority Mail label from the parcel that had been delivered earlier that day as part of the controlled delivery. Thus, following the model of Cruz-Rivera and taking into account the "totality of the circumstances," we conclude that Trooper Lynch had the necessary independent reasonable suspicion to justify extending Reyes's detention beyond an investigation of traffic violations into unrelated drug crimes.

Having determined that the requisite independent reasonable suspicion existed to justify extending the stop, we correspondingly find that Reyes was not illegally detained at the time he consented to the vehicle search, such that his consent was effective to justify the search under Royer. Supra p. 27-28. We can, thus, affirm the district court's finding that because Reyes consented to the search of his vehicle, the warrantless search was reasonable under the Fourth Amendment and the items seized from the vehicle were properly admitted at trial.

### B. Evidentiary Rulings

Reyes raises evidentiary challenges to the district court's admission of certain statements by witnesses Trooper Lynch and Postal Inspector Stephen Dowd. On appeal, Reyes argues the contested statements were not proper lay testimony as they did not

help the jury to understand any facts,[11] but rather unfairly prejudiced him and tainted the proceedings such that a new trial is required.  By contrast, the Government defends the propriety of each of the challenged rulings, while also arguing that even if the district court erred in admitting some or all of the contested evidence, such admissions did not influence the verdict and were, therefore, harmless.  We agree that the contested evidence was either properly admitted or was harmless.

"We review a district court's admission of lay opinion testimony under Fed. R. Evid. 701 for manifest abuse of discretion."  United States v. Jackman, 48 F.3d 1, 4 (1st Cir. 1995).  To be admissible under Rule 701, lay opinion must be: (i) "rationally based on the witness's perception," Fed. R. Evid. 701(a); (ii) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," Fed. R. Evid. 701(b); and (iii) "not based on scientific, technical, or other specialized

---

[11] We note that the heading of the evidentiary section of Reyes's brief appears to contain a typographical error.  The brief asserts that the district court erred in permitting testimony of Inspector Dowd and Trooper Lynch that "failed to meet the second requirement of F.R.Evid. [sic] 702 as it did not help the jury understand any fact."  The second requirement of Fed. R. Evid. 701 on lay testimony -- and not that of Fed. R. Evid. 702 on expert testimony -- enumerates a requirement that testimony be helpful to determining a fact in issue.  In light of the Rules' wording and because nothing else indicates that Inspector Dowd or Trooper Lynch were, or should have been, qualified as expert witnesses under Fed. R. Evid. 702, we assume -- as the Government did in its briefing -- that Reyes intended to lodge objections to Inspector Dowd's and Trooper Lynch's statements under Fed. R. Evid. 701.

knowledge," Fed. R. Evid. 701(c).  As these are conjunctive requirements, lay witness testimony that fails to satisfy a single prong of Rule 701 is not properly admitted.  See Fed. R. Evid. 701(a)-(c).

However, "[n]ot all erroneous evidentiary rulings require reversal."  United States v. Obiora, 910 F.3d 555, 560-61 (1st Cir. 2018).  "It is settled that '[a] non-constitutional evidentiary error is harmless (and, therefore, does not require a new trial) so long as it is highly probable that the error did not influence the verdict.'"  United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (alteration in original) (quoting United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002)).  Such a determination "requires a case-specific examination of . . . 'the centrality of the tainted material,' its prejudicial impact, and any other indications that 'the error affected the factfinder's resolution of a material issue.'"  United States v. Meises, 645 F.3d 5, 24 (1st Cir. 2011) (quoting United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993)).

In the case at bar, the parties agree that the central question -- and indeed the only material issue -- is whether Reyes knew that the package he was transporting at the time of the traffic stop contained cocaine, and thus, whether Reyes was a participant in the conspiracy.  Defense counsel made explicit in closing argument at trial that Reyes does not contest: (i) the

existence of an overarching drug-distribution conspiracy; (ii) that he had been receiving packages for Santiago-Cruz; or (iii) that the Girl Scout Cookie Oven found in his car held concealed cocaine; Reyes only disputes that he knew that said Girl Scout Cookie Oven contained drugs. Because Reyes's defense focused exclusively on his knowing participation, in order for us to hold that it was "highly probable" that the district court's evidentiary rulings "influence[d] the verdict," Flemmi, 402 F.3d at 95 (quoting Piper, 298 F.3d at 56), we must determine that such admitted testimony concerned the "central question" of Reyes's knowledge, see, e.g., Obiora, 910 F.3d at 563 (finding admission of contested testimony harmless because it was "irrelevant to the central question of whether [the defendant] agreed in the first place to distribute heroin").[12] As such, we will examine each of the challenged evidentiary admissions through this lens.

### 1. **Trooper Lynch's Testimony**

At trial, Reyes objected to Trooper Lynch's statements that (i) past narcotics investigations in which Trooper Lynch had been involved typically resulted in arrests for narcotics violations; (ii) Reyes drove like "[h]e knew where he was going"

---

[12] Contra Meises, 645 F.3d at 25 (granting a new trial where "the tainted evidence was central to the prosecution's case and potentially disastrous to the appellants' defense," such that we "[could] not say that it [wa]s 'highly probable' that the errors did not affect the jury's resolution of the case").

on the day of the July 18, 2016 traffic stop; and (iii) Reyes "was trying to make up a story [about] where he was going" while responding to Trooper Lynch's questions during the stop. We conclude that each of these statements was either properly admitted or its admission was harmless error.

a. **Narcotics Investigations Typically Result in Arrests**.

At the beginning of direct examination of Trooper Lynch at trial, the Government engaged in the following exchange with him:

> Q. Okay. So over the last five plus years have you had an opportunity to conduct such investigations into narcotics?
>
> A. Yes, sir.
>
> Q. And on approximately how many different occasions?
>
> A. Hundreds of investigations, sir.
>
> Q. Okay. And what were the results or findings of those investigations?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Sustained.
>
> Q. When you finished those investigations, what would typically happen?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled. You may answer that.
>
> A. We would arrest individuals for narcotics violations.

Reyes objected below and on appeal now contends that such testimony was "in the nature of overview testimony" that served to

impermissibly bolster Trooper Lynch's credibility. (emphasis added). The Government counters that this exchange was not "overview testimony" and did not in any way suggest that Reyes was guilty of the crime charged. While we think that this minimally probative exchange toed the line of propriety, we conclude that any error in its admission was ultimately harmless.

Typically, "[a]n 'overview witness' is a government agent who testifies as one of the prosecution's first witnesses and . . . provides an overview or roadmap of the prosecution's case to come." United States v. Etienne, 772 F.3d 907, 913 (1st Cir. 2014) (citing United States v. Brown, 669 F.3d 10, 24 (1st Cir. 2012)). While there is no "blanket ban on all overview testimony," id. at 914, such testimony is "[d]isfavored" in the drug conspiracy context where a law enforcement agent "based on the results of the agency's overall investigation, rather than on his own personal knowledge or participation" "testif[ies] about a defendant's specific role in [a] charged conspiracy," id. at 913-14.

Here, the contested exchange with Trooper Lynch was not "overview testimony"; Trooper Lynch did not "provide[] a[] . . . roadmap of the prosecution's case to come." Id. at 913. However, Reyes's concerns that the testimony made representations about matters not before the trial court and served only to enhance the jury's confidence in Trooper Lynch -- verging on witness bolstering

-- are nonfrivolous. See United States v. Fields, 660 F.3d 95, 97 n.3 (1st Cir. 2011) (defining "bolstering").[13]

But ultimately, we hold that even if the trial court erred in admitting this exchange, any such error was harmless. This is so because Trooper Lynch's generalized statement did not mention Reyes, let alone discuss his "specific role in the charged conspiracy," Etienne, 772 F.3d at 914; we, therefore, cannot say that this testimony implicated the central question of Reyes's knowledge such that it was "highly probable" that the error "influence[d] the verdict," Flemmi, 402 F.3d at 95 (quoting Piper, 298 F.3d at 56). Our conclusion is buttressed both by the weight of the evidence suggesting that Reyes was a knowing participant in the drug conspiracy, and not just innocently receiving parcels for a friend,[14] as well as by the fact that Trooper Lynch was subject

---

[13] We note that the contested exchange with Trooper Lynch amounted to a recitation of certain language contained in his affidavit presented to the district court in support of the Government's opposition to Reyes's motion to suppress. While such language is commonplace in affidavits presented to a district court judge, lay jurors are not in the same position as a trial judge to analyze such representations in a circumscribed form.

[14] Namely: Reyes received multiple packages for Santiago-Cruz; most of these packages were addressed from relatives of Reyes, despite being for Santiago-Cruz; the packages had slightly incorrect addresses for Reyes and non-deliverable return addresses, a reportedly common characteristic of parcels containing drug contraband; Reyes and Santiago-Cruz had multiple telephone contacts on the days the parcels were shipped and delivered; Reyes met with Santiago-Cruz after the deliveries; Reyes removed the mailing label from the parcel before discarding the box; during the stop, Reyes lied to Trooper Lynch about why he had a Girl Scout Cookie Oven in his car; and so on.

to substantial cross-examination at trial.  See, e.g., United States v. Torres-Galindo, 206 F.3d 136, 140-42 (1st Cir. 2000) (deeming harmless the erroneous admission of a testifying agent's generalized statement that suspects frequently first deny and then later admit their involvement in a crime where the agent's credibility was fully explored at trial and the weight of the evidence against the defendant was "so great" that the "testimony did not likely affect the jury's verdict").

Although we ultimately deem harmless any error in admitting Trooper Lynch's generalized account that narcotics investigations typically result in arrests, in closing, we note that by soliciting this minimally probative testimony, the prosecution created an unnecessary appellate issue.

### b.    **Reyes Drove "like he knew where he was going"**.

Reyes next objects to the admission of Trooper Lynch's testimony that prior to the stop on July 18, 2016, Reyes was driving "like he knew where he was going," elicited in the context of the following exchange:

> Q. Now, are you familiar with the most direct route between 47 Winthrop Street [Reyes's address] and 185 Metropolitan Ave. [Santiago-Cruz's address]?
>
> A. Yes, sir.
>
> Q. And how would that route compare to the route that Mr. Reyes took on that day?
>
> A. In my opinion, it's the most direct route.
>
> Q. And with respect to the route that he took that day, how would you characterize his driving?

- 39 -

A. He knew where he was going.

　　　　[DEFENSE COUNSEL]: Objection.  Move to strike.

The Government contends that such lay opinion was admissible, but argues as a threshold matter that because Reyes "fail[ed] to specify the nature of his complaint" concerning the statement, it should be "deemed waived for lack of development."  (citing Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner . . . are deemed waived.")).  Because Reyes's briefing on this objection consisted of one conclusory sentence, we agree with the Government that Reyes's objection is waived.[15]

c.　　**Reyes "was trying to make up a story [about] where he was going".**

　　　　Reyes further objects to the admission of statements by Trooper Lynch describing Reyes's behavior during the traffic stop. In particular contention is Trooper Lynch's assertion that Reyes

--------

[15] But waiver aside, Reyes's objection is unavailing.  This is so because the Government solicited the contested statement from Trooper Lynch in order to establish its theory that Reyes was driving to Santiago-Cruz's house at the time of the traffic stop. Crucially, Reyes did not dispute that he was going to give the parcel containing the Girl Scout Cookie Oven -- and the concealed drugs therein -- to Santiago-Cruz.  Indeed, the defense's theory of the case hinged on the jury simultaneously accepting that Reyes intended to give the package to Santiago-Cruz, but that he had no knowledge of the package's contents.  Thus, whether or not Reyes was in fact en route to Santiago-Cruz's house at the precise moment of the traffic stop -- the theory to which Trooper Lynch's "he knew where he was going" statement lent support -- was extraneous. Because Trooper Lynch's contested statement shed minimal, if any, light on the central question of Reyes's knowledge of the parcel's contents, its admission -- even if erroneous -- was harmless.

- 40 -

"was trying to make up a story" in the following exchange:

> A. . . . I said, "Where in Boston [are you going]?" But he couldn't say where.
>
> Q. How did his answers to that question differ from his answers to your earlier questions?
>
> A. His demeanor changed. He was holding the steering wheel, and he was looking . . . straight ahead, and he was holding onto the steering wheel and I could see him crumpling something in his left hand.
>
> Q. Before we get to that, what, if any, investigative value did his inability to give you specifics about where he was going have?
>
> A. Like I said to you, sir, I knew more about Mr. Reyes than I let on to believe. So at that time I knew he was trying to make up a story where he was going.
>
> [DEFENSE COUNSEL]: Objection. Move to strike.

On appeal, Reyes contends that Trooper Lynch invaded the province of the jury by opining on "facts relevant to innocence or guilt," including Reyes's veracity during the stop. By contrast, the Government maintains that Trooper Lynch's testimony did not usurp the jury's role, but rather met all of the requirements for lay testimony under Rule 701. The Government's position prevails.

Trooper Lynch's statement satisfied each of Rule 701's requirements for lay testimony: Trooper Lynch's testimony (i) was rationally based on his perceptions under 701(a), as it recounted Trooper Lynch's own interactions with and assessment of Reyes during the stop; (ii) was "helpful" to the jury under 701(b) because Trooper Lynch participated in the conversation with Reyes,

- 41 -

while the jury did not; and (iii) was not based on scientific, technical, or other specialized knowledge under 701(c), because it derived in large part from observations of Reyes's body language and demeanor against the backdrop of Trooper Lynch's personal involvement in the broader investigation.

Although "one can't actually read another person's mind, one is often able to infer, from what the person says or from the expression on his face or other body language, what he is thinking." United States v. Prange, 771 F.3d 17, 29 (1st Cir. 2014) (quoting United States v. Curescu, 674 F.3d 735, 740 (7th Cir. 2012)). Trooper Lynch, as a lay witness, was therefore "free to state his rationally-based perception of what [Reyes] was thinking during their face-to-face conversation." Id.

Reyes's argument to the contrary -- that by opining on "facts relevant to innocence or guilt," including Reyes's veracity during the stop, Trooper Lynch impermissibly usurped the role of the jury -- is unavailing. First, the Federal Rules of Evidence themselves dictate that "lay opinion 'is not objectionable just because it embraces an ultimate issue.'" Id. at 30 (quoting Fed. R. Evid. 704(a)). Here, Reyes does not contend that Trooper Lynch opined on an ultimate issue, but merely implied that his statement concerned "facts relevant to innocence or guilt." Because Trooper Lynch's testimony would not have been ipso facto inadmissible even had it "embrace[d] an ultimate issue," Fed. R. Evid. 704(a), we

- 42 -

cannot accept Reyes's broader proposition that Trooper Lynch's lay opinion "invade[d] the jury's province" and was, thus, inadmissible because it concerned "facts relevant to innocence or guilt." (emphasis added). Nor has Reyes shown that it is categorically impermissible for a lay witness to opine on the veracity of another's out-of-court statements, as each of the cases he invoked either concerned in-court statements, see, e.g., United States v. Thiongo, 344 F.3d 55, 61 (1st Cir. 2003) ("This Court has held it is improper for an attorney to ask a witness whether another witness lied on the stand.") (emphasis added),[16] or were otherwise inapposite, see United States v. Serrano-Osorio, 191 F.3d 12, 14-15 (1st Cir. 1999) (addressing no admissibility of evidence issues).

In light of the above, we conclude that Trooper Lynch's assessment of Reyes during the traffic stop was admissible lay testimony under Rule 701. Our finding of admissibility ends the

---

[16] See also United States v. Sullivan, 85 F.3d 743, 750 (1st Cir. 1996) ("The rule . . . makes it improper to induce a witness to say another witness lied on the stand.") (emphasis added); United States v. Pereira, 848 F.3d 17, 21 (1st Cir. 2017) ("Over the past twenty-five years, this court has consistently held that 'counsel should not ask one witness to comment on the veracity of the testimony of another witness.'") (emphasis added) (quoting Sullivan, 85 F.3d at 750); United States v. Akitoye, 923 F.2d 221, 223-24 (1st Cir. 1991) (finding in part that the trial court "justifiably sustained" the defendant's objection to a question on whether another witness was "lying to this Jury" because it was the kind of "'was-the-witness-lying' question . . . by the prosecutor . . . [that] should never have been posed").

matter; however, we note that even had the district court erred in admitting Trooper Lynch's assessment, such an error would be harmless for the same reasons that admission of Trooper Lynch's generalized account of his past narcotics investigations was harmless: namely, that Trooper Lynch was subject to extensive cross-examination and the other evidence against Reyes was sufficiently substantial. Supra p. 38-39. We determine this to be true even though, here, the contested statement arguably touched upon the case's "central question" of Reyes's knowledge.

Concerning the exploration of Trooper Lynch's credibility, it is important that at trial, defense counsel highlighted specific misperceptions of Trooper Lynch during the traffic stop. For example, in closing, defense counsel noted: "Trooper Lynch admitted that when he stopped Mr. Reyes and he saw . . . little white crumbles in his hands, he assumed it was cocaine. . . . Guess what? He was wrong. It wasn't cocaine." Thus, shortly before the jurors were excused to deliberate, defense counsel underscored that Trooper Lynch's perceptions and assumptions were not infallible. As such, the accuracy of Trooper Lynch's assessment of Reyes during the traffic stop was a matter "presented to the jury for its evaluation." See Torres-Galindo, 206 F.3d at 141.

Moreover, the weight of the evidence continues to be sufficiently substantial such that it is "highly probable" that

Trooper Lynch's assessment of Reyes's veracity during the stop "did not influence the verdict." Flemmi, 402 F.3d at 95 (quoting Piper, 298 F.3d at 56). In addition to the evidentiary proof previously enumerated, supra p. 38 n.14, we also note that defense counsel conceded at trial that Reyes lied to Trooper Lynch at least once during the traffic stop. For example, in closing, defense counsel acknowledged that after the canine unit alerted to the presence of contraband in the Girl Scout Cookie Oven, Reyes was not honest with Trooper Lynch about how or why he came to have the oven in his possession. Thus, the jury had cause to doubt Reyes's veracity during the stop even without Trooper Lynch's assessment. This justifiable doubt coupled with the weight of the other evidence persuade us that it is "highly probable" that any potential error in admitting Trooper Lynch's assessment of Reyes during the stop "did not influence" the jury's resolution of the case.

In sum, although we determine that the district court did not manifestly abuse its discretion in admitting Trooper Lynch's statement that Reyes "was trying to make up a story," any error in admission would also have been harmless.

### 2. Inspector Dowd's Testimony

Finally, Reyes objected to the admission of Postal Inspector Stephen Dowd's lay testimony that the labels on the parcels addressed to Reyes and others appeared to have common

authorship based on the similarity in handwriting.  The following

is an example of the Government and Inspector Dowd's exchanges on

this issue:

> Q. And do you have an opinion with respect to the handwriting on both [labels]?
>
> A. Yes.
>
> Q. And what is that opinion?
>
> A. I believe the same person wrote these labels.
>
> Q. And, again, what's the basis for that?
>
> A. By looking at the different letters, and they appear to be exactly duplicates on both.

As Inspector Dowd gave his testimony, the various labels under

discussion were shown side-by-side on a split-screen for the jury

to view.  On appeal, Reyes argues that Inspector Dowd's lay

testimony was not "helpful" to the jury under Rule 701 where "[t]he

jurors not only could view and compare the handwriting on the

various labels for themselves, but they did so."  By contrast, the

Government maintains that Inspector Dowd's testimony was

"helpful."

While we tend to agree with the Government that Reyes's

"argument misapprehends the scope of Fed. R. Evid. 701,"[17] in any

---

[17] Our standard for excluding lay opinion testimony as "unhelpful" under Rule 701 requires "that the witness [be] no better suited than the jury to make" the judgment at issue. United States v. Kornegay, 410 F.3d 89, 95 (1st Cir. 2005) (emphasis added) (quoting Jackman, 48 F.3d at 4-5).  We find it difficult to say that Inspector Dowd was no better suited than the jury to assess the labels where Inspector Dowd had relevant background from the

case, even if the district court did err in admitting Inspector Dowd's testimony, such error would again be harmless as the testimony did not concern the central question of Reyes's knowledge. The Government used Inspector Dowd's handwriting testimony to help establish that a drug conspiracy existed; but Reyes did not dispute the existence of a conspiracy. Reyes only disputed that he was a knowing participant in said conspiracy. For its part, the Government never attempted to argue that the similar handwriting on the parcel labels was "probative of Reyes's knowledge" or even that Reyes would have "noticed that the handwriting was the same." Indeed, defense counsel itself argued in opening statement that Inspector Dowd "w[ould not] be able to [explain] why a normal, non-law enforcement person would consider [the parcels] suspicious." Thus, because Inspector Dowd's testimony addressed an uncontested issue, and because the Government never invoked Inspector Dowd's testimony to prove the central question of Reyes's knowledge, its admission, erroneous or otherwise, was harmless.

### 3. Conclusion

In sum, having examined each of the challenged evidentiary rulings, we conclude that the district court did not

---

investigation that the jurors did not and his assessment "was not limited to three days in a sterile courtroom setting," Jackman, 48 F.3d at 5.

manifestly abuse its discretion in admitting the contested statements or in the event of any error, such error was harmless. "While we [may] have uncovered a . . . benign bevue[], e.g.," admission of the minimally probative account of Trooper Lynch's past narcotics investigations, this "error[] w[as] not portentous" where "the government's case was very strong," Sepulveda, 15 F.3d at 1196; supra p. 38 n.14. As Reyes has not "achiev[ed] the critical mass necessary to cast a shadow upon the integrity of the verdict," see 15 F.3d at 1196, we deny his request for a new trial.

## C. Speedy Trial Claims

Reyes also lodges pro se claims, alleging -- for the first time on appeal -- violations of his right to a speedy trial under the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, and the Constitution; accordingly, Reyes asks us to vacate his conviction and sentence and to order a new trial. The Government argues that Reyes's claims under the Speedy Trial Act are waived and that his constitutional claim is meritless. We agree with the Government.

### 1. Speedy Trial Act Claims

Reyes raises two issues under the Speedy Trial Act: He claims that his statutory rights were violated first, because he was indicted more than 30 days after his arrest, and second, because his trial commenced twenty-six months after his arrest. The Government correctly contends that because Reyes did not raise

any statutory speedy trial claims in the district court, such claims are waived.

"The Speedy Trial Act . . . is generally concerned with two periods of delay: delay in bringing an information or indictment after arrest and delay in commencing trial after information, indictment, or the defendant's first appearance." United States v. Spagnuolo, 469 F.3d 39, 40 (1st Cir. 2006). The deadlines for these periods are laid out in § 3161(b)-(c)(1): namely, thirty days to indictment and an additional seventy days to trial.[18] Sanctions for governmental non-compliance with § 3161's statutory deadlines include dismissal of charges for overdue indictments and case dismissal for delayed trials. See 18 U.S.C. § 3162.[19] In order to exercise one's remedy for a delayed

---

[18] The Speedy Trial Act, at § 3161, provides in pertinent part:

. . .

**(b)** Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges. . . .

**(c)(1)** In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. . . .

[19] Section 3162 of the Speedy Trial Act provides in pertinent part:

**(a)(1)** If, in the case of any individual against whom a

- 49 -

trial, § 3162(a)(2) explicitly requires a defendant to file a motion for dismissal; we have clarified that a defendant must also file a motion to remedy a delayed indictment under § 3162(a)(1), Spagnuolo, 469 F.3d at 44-46 (concluding "the motion and waiver provision of § 3162(a)(2) also applies to § 3162(a)(1) speedy indictment claims"). Thus, a defendant's failure to timely file a motion to remedy speedy indictment and/or speedy trial violations under the Speedy Trial Act will result in a waiver of such rights for which "not even plain error review is available." Id. at 41.

Here, the Government maintains that Reyes failed to move for dismissal under either § 3162(a)(1) or (2) prior to trial. Because Reyes has not identified anything in the record that preserves his statutory speedy trial claims, we find such claims are waived.

---

complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped. . . .

**(2)** If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. . . . Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.

(emphasis added).

## 2.   Constitutional Claim

Reyes further argues that the twenty-six-month delay between his arrest and trial violated his constitutional right to a speedy trial. The Government counters that Reyes's constitutional claim -- though not waived as a result of Reyes's failure to raise it below -- is nevertheless meritless, and we agree.

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "[T]he seminal Supreme Court case interpreting this directive," Barker v. Wingo, supplies a "quadripartite balancing test for use in evaluating potential speedy trial violations" under which courts must consider the: (i) length of delay; (ii) reason for the delay; (iii) defendant's assertion of his right; and (iv) prejudice to the defendant. RaShad v. Walsh, 300 F.3d 27, 33-34 (1st Cir. 2002) (discussing Barker v. Wingo, 407 U.S. 514, 530-33 (1972)). No single factor is dispositive, Barker, 407 U.S. at 533, but rather courts must weigh the factors "on a case-by-case basis 'together with such other circumstances as may be relevant,'" United States v. Mala, 7 F.3d 1058, 1061 (1st Cir. 1993) (quoting Barker, 407 U.S. at 533).

While a defendant "does have some responsibility to assert his speedy trial claim," United States v. Perez-Cubertier,

958 F.3d 81, 91 (1st Cir. 2020), (citing Look v. Amaral, 725 F.2d 4, 6-7 (1st Cir. 1984)), cert. denied, 141 S. Ct. 349 (2020), "a defendant who fails to demand a speedy trial" under the Sixth Amendment does not "forever waive[] his right," Barker, 407 U.S. at 528. Instead, a "defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered" under the quadripartite inquiry, id., with a "failure to assert the right [making] it difficult for a defendant to prove that he was denied a speedy trial," id. at 532.

Applying the quadripartite balancing test, we find no violation of Reyes's constitutional right to a speedy trial.

### a. Length of Delay.

The first factor concerning the length of the delay between arrest or indictment, on the one hand, and the date of trial, on the other hand, weighs slightly in Reyes's favor. This factor serves as a "triggering mechanism," meaning that "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors." Barker, 407 U.S. at 530. "While '[t]here is no bright-line time limit dividing the lengths that trigger further Barker inquiry from those that do not,' a '[d]elay of around one year is considered presumptively prejudicial.'" United States v. Handa, 892 F.3d 95, 102 (1st Cir. 2018) (alterations in original) (quoting United States v. Irizarry-Colón, 848 F.3d 61, 68 (1st Cir. 2017)). Thus, we find

that the twenty-six-month delay between Reyes's arrest and trial is sufficient to trigger further Sixth Amendment review. See United States v. Lara, 970 F.3d 68, 82-83 (1st Cir. 2020) (finding no speedy trial right violation despite delay of eighteen months after weighing the factors in toto), cert. denied sub. nom Williams v. United States, 141 S. Ct. 2821 (2021); see also United States v. Muñoz-Franco, 487 F.3d 25, 60-62 (1st Cir. 2007) (finding no speedy trial right violation despite delay of five years between indictment and trial after weighing the factors in toto).

### b.    **Reason for the delay**.

The second factor -- our "focal inquiry" concerning the explanation for the delay, Muñoz-Franco, 487 F.3d at 60 (quoting United States v. Santiago-Becerril, 130 F.3d 11, 22 (1st Cir. 1997)) -- weighs against Reyes. The Supreme Court has instructed that "different weights should be assigned to different reasons" offered to explain the delay between arrest or indictment and trial. Barker, 407 U.S. at 531. For example, "deliberate attempt[s] to delay the trial in order to hamper the defense should be weighted heavily against the government," id.; whereas, "to the extent that valid reasons cause delay," or the "delay . . . is caused by the defendant," it "does not count against the state at all," RaShad, 300 F.3d at 34. The defendant bears the burden of proving bad faith or inefficiency on the part of the government in causing the delay. See, e.g., Lara, 970 F.3d at 82 (finding the

"second factor point[ed] against . . . a speedy trial violation" where the defendant "d[id] not identify any evidence that the delay was a product of bad faith or inefficiency on the government's part").

Here, because Reyes has produced no evidence of bad faith on the part of the government -- and in fact has only highlighted valid actions that justified an appropriate delay -- the second factor weighs against him. In his pro se appeal brief, Reyes raises the fact that the district court granted fifteen continuances of his trial over the span of twenty-six months. However, the Government counters -- and a review of the case filings cited by Reyes confirms -- that "Reyes caused or expressly assented to nearly all, if not literally all, of the delay." For example, in the time between Reyes's arrest and trial, Reyes asked for more time both for discovery and to file his pre-trial motions, as well as filed a pre-trial motion to suppress that took over six months to resolve. Because the Supreme Court has declined to find speedy trial violations where the defense failed to object to continuances, see, e.g., Barker, 407 U.S. at 536, and we have declined where the defense significantly contributed to the delay through filing its own requests for continuances or pretrial motions, see, e.g., Muñoz-Franco, 487 F.3d at 60-61, here too, we do not find government action suggestive of a violation. The second factor, thus, weighs against Reyes.

### c.   Defendant's Assertion of His Right.

As previously discussed, "[a]lthough a defendant does not waive his constitutional right to a speedy trial by failing to assert it" prior to trial, "his failure to do so means that he must make a much stronger showing on the other factors in order to succeed in his claim."  RaShad, 300 F.3d at 34 (citing Barker, 407 U.S. at 532).  Here, Reyes did not raise a constitutional speedy trial claim below, which "significantly undermines [his] claim." Perez-Cubertier, 958 F.3d at 91.

### d.   Prejudice to the Defendant.

Reyes also fails to prove that he has suffered cognizable prejudice as a result of the delay.  The prejudice prong seeks to protect three interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."  Barker, 407 U.S. at 532.  "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  Id. "[T]he defendant bears the burden of alleging and proving specific ways in which the delay attributable to the [government] unfairly compromised his ability to defend himself."  RaShad, 300 F.3d at 34 (citing United States v. Aguirre, 994 F.2d 1454, 1455 (9th Cir. 1993)).

Reyes has not carried this burden. Reyes alleges only the third kind of prejudice pertaining to impairment of the defense; specifically, Reyes contends that the prosecution "gained a tactical advantage" via the twenty-six-month delay between his arrest and trial because the Government ostensibly used that time to "coach" Trooper Lynch on a narrative that would make the traffic stop of Reyes appear to be constitutional. By contrast, the Government maintains that Reyes's claim of prejudice is unsupported and illogical given that Reyes and his counsel caused much of the delay. We agree with the Government.

Although Reyes claims that differences exist in Trooper Lynch's original statement on the traffic stop as compared to his second statement taken seventeen months later, he provides no explanation as to why Trooper Lynch's original statement would not support the constitutionality of the traffic stop, while his second statement would; put simply, Reyes has not explained how any differences in Trooper Lynch's statements conferred a tactical advantage to the Government. Moreover, Reyes's assessment of the Government's motive is entirely speculative. Because we have declined to credit speculation in the past, see, e.g., United States v. Souza, 749 F.3d 74, 83 (1st Cir. 2014) ("Though Souza speculates about prejudice, he points to nothing in the eighteen-month period between his arrest and trial that impaired his ability to mount a defense."), here too, Reyes has not carried his burden

in proving prejudice attributable to delay.  The fourth factor, thus, weighs against Reyes.

Having weighed all four of the Barker factors, we find no violation of Reyes's right to a speedy trial under the Sixth Amendment.  We, therefore, decline Reyes's request to vacate his conviction and sentence and to order a new trial.

### D.  **Presence Claims**

Finally, Reyes argues pro se that his absence at pre-trial proceedings on October 11, 2016, April 4, 2017, and August 7, 2017, violated Fed. R. Crim. P. 43(a), the Fifth Amendment's Due Process Clause, and the Sixth Amendment's Confrontation Clause such that his conviction and sentence should be reversed and a new trial ordered.  The Government maintains that Reyes's claims have "no legal basis."  Because Reyes did not object to his absence below, we review each of these claims for plain error; that is, Reyes "must show, among other things, both that any error was clear or obvious and that it affected his substantial rights."  United States v. Karmue, 841 F.3d 24, 27 (1st Cir. 2016) (citing United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012)) (applying plain error review to claims under Fed. R. Crim. P. 43(a) and the Fifth Amendment's Due Process Clause raised for the first time on appeal); United States v. Acevedo-Maldonado, 696 F.3d 150, 155-56 (1st Cir. 2012) (same for unpreserved Confrontation Clause objections).  We find no plain error.

### 1. Fed. R. Crim. P. 43(a)(1) Claim

Reyes's statutory claim has no legal basis and fails. Fed. R. Crim. P. 43 provides that a "defendant must be present at: (1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing," Fed. R. Crim. P. 43(a)); the rule further states "a defendant need not be present when '[t]he proceeding involves only a conference or hearing on a question of law,'" United States v. Veloz, 948 F.3d 418, 434 n.4 (1st Cir. 2020) (alteration in original) (quoting Fed. R. Crim. P. 43(b)(3)); see also Karmue, 841 F.3d at 28 (holding no clear or obvious violation of Rule 43 where defendant was not present at pretrial Daubert hearing). In Reyes's case, a review of the relevant case filings reveals that the contested pre-trial proceedings from which Reyes was absent were status conferences to discuss discovery and scheduling. We, thus, find that Fed. R. Crim. P. 43 did not require Reyes to be present, and Reyes has not established that proceeding at these pre-trial hearings without him present constituted a clear or obvious error.

### 2. Fifth Amendment Claim

We, likewise, reject Reyes's presence claim lodged under the Fifth Amendment. The Due Process Clause of the Fifth Amendment "requires that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence,'"

- 58 -

Veloz, 948 F.3d at 435 (quoting Kentucky v. Stincer, 482 U.S. 730, 745 (1987)); "whenever [a defendant's] presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge," he has a due process right to be present at the proceedings, United States v. Gagnon, 470 U.S. 522, 526 (1985) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1934)) (rejecting claim of due process violation where in camera discussion at trial did not include respondent).  Here, "[i]t is not clear or obvious . . . what the benefit of [Reyes]'s presence" at the contested pre-trial status conferences would have been. Karmue, 841 F.3d at 27.  Because Reyes has not demonstrated that his "absence 'affected [his] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings,'" id. (alteration in original) (quoting United States v. Fernández-Hernández, 652 F.3d 56, 64 (1st Cir. 2011)), Reyes has not shown any error -- obvious or otherwise -- and his Fifth Amendment claim also fails.

### 3.    Sixth Amendment Claim

Finally, Reyes's Sixth Amendment claim is inapposite. The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause "has historically applied to testimony elicited at, and evidence produced for, trial," United

States v. Mitchell-Hunter, 663 F.3d 45, 51 (1st Cir. 2011), and we -- and the Supreme Court -- have thus far declined to extend the reach of the Confrontation Clause beyond trial, see, e.g., id. at 50-53 (noting that defendant "d[id] not point to a single case extending the right to confrontation beyond the context of trial"); see also Crawford v. Washington, 541 U.S. 36, 53-56 (2004) (extending right to confrontation only to declarants whose statements are offered at trial). Reyes's presence claims concern only his absence at pre-trial proceedings and he offers no arguments as to why we should extend the reach of the Confrontation Clause beyond trial in this case. Moreover, even if we were to extend the right to confrontation here, such a right would be inapplicable as Reyes points to no evidence that was offered against him at these proceedings; indeed, such pre-trial status conferences would not present an opportunity to do so. Here too, Reyes has failed to show plain error.

Accordingly, we decline to reverse Reyes's conviction and sentence and to order a new trial because he was not present at three of the pre-trial court dates.

### III. Conclusion

For the reasons stated above, the judgment of conviction is **affirmed.**